2001 OK CR 34

**Earl Alexander FREDERICK, Sr., Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. D–1998–293.

Court of Criminal Appeals of Oklahoma.

Nov. 21, 2001.

**914**

916

Robert H. Macy, District Attorney, Oklahoma County, Sandy Elliott, Susan Caswell, Assistant District Attorneys, Oklahoma City, OK, Attorneys for the State.

Catherine Hammersten, Bert Richard, Assistant Public Defenders, Oklahoma County, Oklahoma City, OK, Attorneys for Defendant.

Robert A. Ravitz, Public Defender of Oklahoma County, Wendell B. Sutton, Assistant Public Defender, Oklahoma City, OK, Attorneys for Appellant.

W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee.

**OPINION**

LILE, Judge:

¶ 1 In 1992, Earl Alexander Frederick, Sr., Appellant, was tried by jury in the District Court of Oklahoma County, Case No. CF–90–734, was convicted of Murder in the First Degree, and was sentenced to death. On August 30, 1995, that conviction was reversed and remanded for a new trial. *See Frederick v. State*, 1995 OK CR 44, ¶ 31, 902 P.2d 1092, 1099.

¶ 2 The Honorable Virgil C. Black, District Judge, conducted the retrial before a jury from February 23 through March 6, 1998. Appellant was again found guilty of Murder in the First Degree, 21 O.S.Supp.1989, § 701.7(A) (Malice Aforethought), and punishment was again set at death. Two statutory aggravating circumstances were found to exist beyond a reasonable doubt:

1. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and

2. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

¶ 3 The court imposed the death sentence on March 13, 1998,[1] in accordance with the jury verdict. Frederick is before this Court on direct appeal from this second conviction and sentence.

**FACTS**

¶ 4 Brad Beck was murdered by Frederick on November 11, 1989, in Spencer, Oklahoma. Mr. Beck was partially paralyzed and required a cane for walking. Mr. Beck was house-sitting in Spencer for his cousin, Terri Smith, who was visiting her mother in New Mexico. Frederick, who used many aliases, had been staying with Beck from approximately November 7 through November 11, 1989, going by the name "Jeff."

¶ 5 Ms. Smith usually called Beck daily. She had expressed concern that this stranger, Jeff, whom she had never met, had moved into her house while she was gone. When she talked to Beck, for the last time, on

1. Appellant's Petition in Error was filed in this Court September 10, 1998. An evidentiary hearing on trial transcript issues was held in District Court on August 4, 1999, and District Court Findings of Fact and Conclusions of Law were filed August 11, 1999. Appellant's Brief was filed February 28, 2000, Appellee's Brief was filed June 23, 2000, and Appellant's Reply Brief was filed July 28, 2000. Oral argument was held January 16, 2001. Appellant's Supplemental Authorities after Oral Argument were filed January 26, 2001.

Saturday morning, November 11, he told her he would ask Jeff to leave.

¶ 6 Frederick brutally clubbed Beck to death that day and drove his body to a nearby field. He ransacked the house, pulling out drawers looking for valuables. Frederick then drove Beck's pickup some 300 miles to Dumas, Texas, north of Amarillo, where he listed Beck's pickup on a motel registration and used another alias, "Larry Davis." He took with him numerous items stolen from Beck, Terri Smith, and Michael Don Smith.

¶ 7 Three days later, Frederick bludgeoned and shot to death an acquaintance, Mr. Shirley Fox (a 76–year–old disabled man), in Texline, Texas. Texline is on the west edge of the Texas panhandle, nine miles from Clayton, New Mexico, where Frederick had lived for the preceding four years. Frederick parked Beck's pickup in a row of old cars at Fox's house after removing the tag.[2] He transferred the property he had stolen from Beck and the Smiths into Mr. Fox's blue 1975 Chevrolet Impala. He ransacked Fox's house, pulling out drawers as he had in Oklahoma, and took two shotguns (including the one he had just used to shoot Fox), a .22 rifle, coin collections, jewelry, and other property.

¶ 8 That evening, Frederick stayed at a motel in Dalhart, Texas, about midway between Texline and Dumas, using another alias, "R.J. Collier," and listed Mr. Fox's Chevy on the motel registration. The next day he drove to Amarillo in the stolen car with the stolen property.

¶ 9 Mr. Fox's body was found in his home November 16. He had been beaten with a claw hammer that was found nearby. One of his ears had been mangled and partially torn off by the force of a blow to his head. One of his fingers was almost severed. He had also been shot with his own shotgun at close range. Frederick later told officers he had sold the guns and coin sets in Amarillo for $200. When the shotgun was recovered in

Amarillo, it still had Mr. Fox's dried, splattered blood on it. When Beck's pickup was found abandoned at Fox's house November 16, blood smears were found inside the cab that were the same as Beck's blood type. The jury heard testimony in the first stage of the trial that Mr. Fox's car was stolen, but they were not told until the second stage that he was murdered.

¶ 10 Beck's mother reported him missing on November 17, 1989. An officer went to Terri Smith's house to look for him, but he was not found. On November 25, officers with the Sheriff's Office crime lab were dispatched to the Smith residence. Captain James Rouse testified that drawers were open and that there was dried blood on the floor furnace grating and on the inside of the front door facing.

¶ 11 Late on November 19, police in Amarillo, Texas, spotted a woman driving Mr. Fox's car. Patrolman Ward pulled her over, and she told him she had borrowed the car from a man she had met in a bar a couple of days earlier named "R.J." She gave the police a description of R.J. and told them he was inside the Unique Club. They found a person at that club who matched the detailed description she had given, and he was arrested. "R.J." turned out to be Frederick. He gave the officers his correct name, Earl Frederick, Sr.

¶ 12 When they drove past Fox's car, Frederick initiated a conversation by asking "if the girls that he had loaned his vehicle to had gotten busted for speeding or something?" Officer Oakley then asked Frederick if that was his car, and "He said that it was." Frederick then volunteered that "he had bought the car a few nights earlier." After Frederick was advised of his rights at the police station, he further stated he had bought the car for $300 from four persons in Cactus, Texas. He gave consent to search his motel room, and the police found numerous items stolen from Smith's house including jewelry, Beck's war medals, and a birth

2. A New Mexico state highway department employee found the Oklahoma license plate from Beck's pickup in a roadside trash can near Clayton, New Mexico. Beck's glasses, his cane, and the glove he normally wore on his paralyzed hand were found at a picnic area 18 miles east of Texline. Also, receipts and documents were found there, some with his name and others with Terri Smith's name on them. The cane was hanging from a tree limb.

certificate belonging to Terri's brother, Michael Don Smith.

¶ 13 The Dallam County District Attorney Investigator, Tim Bell, interviewed Frederick on November 20. He said he had lived in the area near Texline at Clayton, New Mexico. He had married under the name R.J. Forster [3] and had lived there for four years with his wife Nadine Forster. He admitted that he knew Beck, but at first denied that he had killed him. He told Bell that he and Beck had planned to drive Beck's pickup to New Mexico. He said they had changed their plans, and that Beck told him to go on in the pickup, and that he, Beck, was just going to hitchhike to Mexico and "drop off the face of the earth." Frederick admitted he had driven Beck's pickup from Oklahoma City to Dumas, Texline, and Clayton, but claimed Beck had given him the truck. He repeatedly said, if you want to talk to Beck, you will have to go to old Mexico.

¶ 14 Frederick signed a statement in which he said he drove Beck's pickup from Clayton to a bar in Texline on November 14, where he met a man named Paul Encenia. He denied that he personally had killed Fox, but claimed he was present while Encenia had killed Fox with a hammer. He admitted that he had stolen Fox's car, guns, and coins.

¶ 15 The next day, November 21, in Dallam County, Frederick was again advised of his rights and again waived those rights. Paul Encenia had been brought in for questioning based on Frederick's accusation that he killed Mr. Fox. When Frederick and Investigator Bell passed by Encenia in the jail, Encenia confronted Frederick and said, "Hey man, why are you telling all those lies on me. I haven't done nothing." Frederick did not respond to the accusation at that time.

¶ 16 Later that day, Frederick had the jailer notify Officer Bell to return to the jail. This time he told Bell, "My name is Larry Davis, and I need to talk to you quick, Jeff doesn't let me out very long." He added: "I'm an ex-policeman, and I'm the only one that can tell the truth."

¶ 17 Bell further testified:

"He [Frederick] told me Earl had lied to me when I had talked to him earlier about the old man. He said Paul Encenia had nothing to do with the old man. In fact he [Paul] wasn't even there and Jeff was the one that did it all and Jeff was the one that killed the old man.

"He also told me Jeff was the one who made Larry and Earl and R.J. do things they didn't want to do. And then he went on to tell me about Jeff had killed Bradford Beck and that the body had been dumped in an open field near Spencer, Oklahoma. And I asked him, well, did you bury the body, did you cover the body, or what? And he said, '[No], it's in an open field near Spencer, Oklahoma.'"

¶ 18 A week later on November 28, Frederick met his appointed Texas lawyer, David Green. He displayed his same repertoire of characters that he had displayed for Officer Bell. Larry Davis however, was not portrayed as the same ex-police officer, the role he had played for Officer Bell, but was now portrayed as a crying 13-year-old boy, who was afraid of the situation and didn't know where he was. Frederick never displayed these personalities to Green again, and for the next year in the Dallam County Jail, he was just "Earl" to his lawyer.

¶ 19 Deputy Scott testified that Frederick said he used the different aliases—Larry Davis, R.J. Forster, and Collier—"in order to avoid confrontation from the law."

¶ 20 Two months later, Beck's partially decomposed and mummified corpse was found still lying face up, uncovered, and unburied in an open field in Spencer, Oklahoma, near Smith's house, corroborating the description of the murder given by Frederick. Beck's friends and family testified that because of his paralysis, he could not have walked more than a few feet without his cane and could not have traveled to the field alone without his cane and his pickup. The autopsy revealed that Beck's skull had been crushed in three places by trauma from a blunt instrument.

---

**3.** This name is sometimes spelled "Forster" and sometimes spelled "Forrester" in the record. For consistency, we will spell it "Forster" each time it is used.

¶ 21 Several witnesses identified Frederick at trial as the "Jeff" that had stayed several days at Smith's house with Beck up until November 11, 1989, when Beck disappeared. One witness had even spent the night there twice with Jeff and Beck. There was testimony that Jeff and Beck drank wine and smoked marijuana the week before, and on the morning of, November 11, 1989, but there was no evidence that either was intoxicated.

¶ 22 Later, in 1997, Appellant claimed to his psychiatrist, Dr. Coons, that he could not remember anything that had happened from 1985 through November 1989, including his second marriage [the marriage to Nadine Forster] or anything about the two murders. Frederick did not testify at his trial.

¶ 23 Further facts will be mentioned when relevant to particular propositions of error.

## COMPETENCY TO STAND TRIAL

¶ 24 Appellant has subdivided his proposition on competency into Subpropositions 5(B), 5(C), 5(D), 5(E), and 5(F). Number 5(A) is not a subproposition, but is entitled "Procedural Background and Competency Evidence." We will discuss 5(F) later under the heading, "First Stage Issues."

¶ 25 In Subproposition 5(B) Appellant's counsel on appeal claims Appellant and his trial attorneys had no right to "waive" jury for his competency trial held in 1997. Judge Black commented at the time, "And now, although there's an allegation that you're incompetent, we are back for you to waive your right to a jury trial, kind of a catch 22.... If you're competent, you can waive your right, if you're incompetent you really can't." Nonetheless, Appellant and his trial counsel did not want a jury trial on competency and filed a written withdrawal of their request for jury trial. It was held as a bench trial on July 10, 1997.

¶ 26 Appellant argues that once a doubt about a defendant's competency had been found by the court, he would no longer be competent to "waive" jury for the competency trial. However, **no** examination and therefore no post-examination competency hearing would be required unless the court

first makes the threshold finding that there is a doubt as to the defendant's present competency. *Hammon v. State,* 2000 OK CR 7, ¶ 48, 999 P.2d 1082, 1094, *cert. denied,* 531 U.S. 1090, 121 S.Ct. 812, 148 L.Ed.2d 697 (2001). If Appellant's argument were correct, every post-examination competency hearing would have to be held as a jury trial, contrary to the statute that provides that a jury trial shall only be provided upon demand. 22 O.S.Supp.1996, § 1175.4(B).

¶ 27 The right to a jury trial **on guilt or innocence** in a felony criminal case is constitutional, and the trial must be held as a jury trial unless properly waived. Obviously, however, the constitutional right to a jury trial does not apply to every pre-trial hearing in a criminal case. We have held that the right to a jury trial on competency is only statutory, not constitutional. *Miller v. State,* 1988 OK CR 29, ¶ 7–11, 751 P.2d 733, 738, *quoted in Hammon v. State,* 1995 OK CR 33, ¶¶ 44–45, 898 P.2d 1287, 1298 ("[T]here is no right under the Sixth and Fourteenth Amendments of the United States Constitution, or under Article II, § 19 or 20, of the Oklahoma Constitution, to a jury trial in a competency hearing. The right to have a jury hear the question of the accused's competency is statutory and must be demanded.")

¶ 28 In Oklahoma, a hearing on competency in a criminal case is tried to the court *unless* a jury trial is *demanded.* 22 O.S. Supp.1997, § 1175.4. If no demand for jury trial is made, the competency hearing, by statute, is tried to the judge, not to a jury. Appellant and his counsel in 1997 first demanded, and then properly withdrew, a demand for a jury trial for the post-examination competency hearing. It was properly held before the judge. This subproposition is denied.

¶ 29 In Subproposition 5(C)(1) Appellant complains that he received a "fundamentally unfair competency trial." First, he says he was not given "adequate" notice of the substance of Mary Frederick's testimony, citing *inter alia,* 22 O.S.Supp.1996, § 2002(A)(1), which says:

"1. Upon request of the defense, the state shall be required to disclose the following:

 a. the names and addresses of witnesses which the state intends to call **at trial,** together with their relevant, written or recorded statement, if any, or if none, significant summaries of any oral statement...." (Emphasis added.)

This statute only mandates discovery of witnesses who will be called at the trial on the merits, not at post-examination competency hearings. Even though not required, a summary of oral statement of the witness was provided in this case. A summary, by definition, cannot be expected to be a verbatim script of a witness's testimony. There is no error here.

■ ¶ 30 Appellant in Subproposition 5(C)(2) also cites eight references, by range of page numbers only, between pages 47 and 65 of the competency hearing transcript, where trial counsel objected to questions or moved to strike answers during Mary Frederick's testimony. Appellant complains that these defense motions "based on relevancy, hearsay, leading, lack of a proper foundation, and, taken in context, other crime evidence" were improperly overruled by the trial judge, and that "Appellant was consequently denied his right to confront the witnesses against him." Actually two of trial counsel's objections in the cited pages were "lack of notice," which we have already discussed. Appellant then cites several sections of the Evidence Code, pertaining to such principles as relevancy and hearsay exceptions, and cites several cases, but does not connect the citations with specific allegations of error and makes no further argument. "It is necessary for counsel ... not only to assert error, but to support his contentions by both argument and the citations of authorities." *Bowers v. State,* 1982 OK CR 103, ¶ 17, 648 P.2d 835, 838. We examine for plain error only and find no plain error or improper rulings by the trial court in the cited pages of transcript.

■ ¶ 31 We next consider Appellant's Subproposition 5(C)(3). Rather than try to represent it, we quote it in full:

"Third, the trial judge [at the 1997 post-examination competency hearing] errone-ously believed he lacked the legal authority to order that Mr. Frederick be sent to Eastern State Hospital, or any other appropriate state mental health facility, for further mental evaluation and/or treatment, including memory restoration, pending trial (Comp.[Tr.] 82–90). This was an abuse of discretion. *See Walker v. State,* [1989 OK CR 65], 780 P.2d 1181, 1183 (Okl.Cr.1989); Okla. Stat. tit. 22 §§ 1175.3(D)(1) & (2), 1175.6(A)(2), 1175.7 (Supp.1997)."

The statutes cited by Appellant, 22 O.S.Supp. 1987, §§ 1175.3 through 1175.7, do not support his position that the court abused its discretion in his case. Section 1175.6 provides that a criminal defendant can be committed to the State Department of Mental Health for *treatment* only if he is found "incompetent." As the court found Appellant competent, it would have no authority to commit him for treatment.

¶ 32 We find that Appellant unfairly characterizes the proceedings reported in the cited pages of the competency hearing transcript. The trial judge did not state his belief. Rather, he asked defense counsel, after the evidence and closing arguments had been concluded, whether there was any way he could postpone his ruling on competency and order Appellant to be sent to the state hospital for treatment of his amnesia, which is what Appellant was asking for. The trial court's ruling denying commitment for treatment was consistent with his finding of competence, was supported by the evidence, and was consistent with our statutes. This subproposition is therefore denied.

¶ 33 Subproposition 5(C)(4) in its entirety reads: "Fourth, the trial judge was biased. *See* Proposition XIII, *infra.*" We will consider this under Proposition Thirteen below.

■ ¶ 34 In Subproposition 5(D) Appellant contends that he was incompetent to stand trial in 1998, that the trial court did not consider proper factors in determining competency, and that the determination of competency was clearly erroneous and not "adequately" supported by the evidence. Appellant claims he "presented evidence that proved by a preponderance of the evi-

dence that he was legally incompetent from amnesia, that is, that the amnesia precluded Appellant from effectively assisting in his defense." The report of Appellant's own psychiatrist, Dr. Coons, submitted at the competency hearing, said:

"He was cooperative. No depression was noted and **his thinking was intact without evidence of psychosis.** A number of PTSD symptoms were noted as described above. **He was well oriented and appeared of average intelligence.**" (Emphasis added.)

¶ 35 Appellant's sister, Mary Frederick, testified at the competency hearing that he frequently used false identities, which he explained by claiming that he was working as an undercover police officer. Earlier in 1989 Frederick had shown up at Mary's house in Oklahoma and told her he was working undercover in Texas and using the name Ray King. He had a birth certificate, a driver's license, and credit cards in King's name. Frederick appeared to be his normal self. He never claimed to her that he actually was King. He had never claimed nor pretended to her, nor appeared to her to believe, that he actually was any of his undercover identities.

¶ 36 We said in *Campbell v. State*, 1981 OK CR 136, ¶ 7, 636 P.2d 352, 355, *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983):

"The purpose of the competency trial is to determine whether a defendant has 'sufficient **present** ability to consult with his lawyer with a reasonable degree of rational understanding, and whether he has a rational, as well as factual understanding of the proceedings against him.' *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)." (Emphasis added.)

We held in *Siah v. State*, 1992 OK CR 59, ¶ 7 & n. 1, 837 P.2d 485, 486 & n. 1:

"Appellant cites no case which has held that amnesia, whether due to substance abuse, trauma or a disease, creates *per se*, lack of competence to stand trial. On the contrary each court which has squarely confronted the issue has found loss of memory regarding events surrounding the alleged crime does not in and of itself create lack of competence to stand trial." [1]

Footnote 1: "Cases across the country consistently hold loss of memory as to the alleged incident is not *per se* lack of competence to stand trial." (Citing twelve cases from other states.) (Citations omitted.)

¶ 37 We find in Frederick's case, as in *Siah*, that the present inability to remember the events surrounding the crime does not impair the defendant's rational thought process and therefore is not incompetence. Appellant's Subproposition 5(D) is denied.

¶ 38 In Subproposition 5(E) Appellant contends that his trial counsel made an internal office request to the Oklahoma County Public Defender's Office, which request was denied, for funds for memory treatment in a secure, in-patient facility. He claims that he was denied the proper assistance of a psychiatrist at trial because his counsel's own office did not provide him funds for treatment of his amnesia. Appellant cites Oklahoma cases *Fitzgerald v. State*, 1998 OK CR 68, ¶¶ 15–30, 972 P.2d 1157, 1164–70; *Frederick v. State*, 1995 OK CR 44, ¶¶ 16–26, 902 P.2d 1092, 1095–98; and *Washington v. State*, 1992 OK CR 43, ¶¶ 5–12, 16, 836 P.2d 673, 674–677. None of these cases however support his proposition that he is entitled to treatment for his amnesia, or any other mental condition, before he can proceed to trial. He was provided with a psychiatrist at this retrial, and therefore there was no *Ake* violation. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This proposition is denied.

## VOIR DIRE ISSUES

### Court Excused Six Prospective Jurors for Cause

¶ 39 In Appellant's second proposition of error, he complains that six (6) prospective jurors were excused for cause by the court in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He claims that Mr. Cunningham, Mr. Cutter, Mr. Dill, Ms. Saner, Mr. Blakely, and Ms. Gross were excused because of their opposition to the death penalty without an adequate examination to determine if they

could follow the law and consider the death penalty along with the other punishment options. We have stated in *Gilbert v. State,* 1997 OK CR 71, ¶ 26, 951 P.2d 98, 108, *cert. denied,* 525 U.S. 890, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998), and *Carter v. State,* 1994 OK CR 49, ¶ 19, 879 P.2d 1234, 1243–44, *cert. denied,* 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995) (*quoting Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985)):

> "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is 'whether the juror's views would prevent, or substantially impair, the performance of his duties as a juror in accordance with his instructions and his oath.' "

This Court has held that a juror "is only required to be willing to consider all the penalties provided by law and not be irrevocably committed [to one] before the trial has begun." *Carter,* 1994 OK CR 49, ¶ 20, 879 P.2d at 1244. On review, this Court must look at the entirety of the juror's *voir dire* to determine if the trial court properly excused the juror for cause. *See Castro v. State,* 1992 OK CR 80, ¶ 14, 844 P.2d 159, 166, *cert. denied,* 510 U.S. 844, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993).

¶ 40 Prospective jurors Cunningham, Cutter, Dill, Saner, Blakely, and Gross each stated that they could not under any circumstances impose the death penalty.

¶ 41 Mr. Cunningham stated that although he did not oppose the death penalty in general, he could not personally impose that punishment. Defense counsel asked, "Can you envision any circumstance where you could look a defendant in the eye and say I voted for capital punishment?" He answered, "No."

¶ 42 Mr. Cutter said that, for religious reasons, he could not sentence someone to the death penalty regardless of what information or evidence he had and that nothing could be said by either side that would change his mind.

¶ 43 Mr. Dill said, "I wouldn't be willing to impose the death penalty." He said, "Maybe if it was a relative, you know, a relative of mine had been murdered or someone that I loved or cared for, then maybe I could. But in this case, I don't think so. I know I wouldn't." The court asked, "No matter what the evidence is?" Mr. Dill answered, "That's correct." He said he would not be able to follow the instructions to consider all three punishments.

¶ 44 Ms. Saner said, "I could not give someone the death penalty." She could not see herself voting for a penalty of death regardless of the evidence, regardless of the situation, under any circumstances. Mr. Blakely said, "I don't believe in the death penalty." He could not envision any situation or circumstance where he would be willing to vote for the death penalty. Ms. Gross could not envision a set of facts and circumstances where she could vote for the death penalty in a case. She was asked, "Under any circumstances?" She answered, "No." She was asked, "No matter what?" She answered, "No."

¶ 45 We find from a review of the entire record on *voir dire* that the trial court properly acted within its discretion in excusing these prospective jurors, and Frederick's second proposition is denied.

### Court's Refusal to Excuse Two Jurors for Cause

¶ 46 Appellant claims in Proposition Three that the trial court improperly refused to excuse for cause two prospective jurors, Fuller and Richardson, thereby depriving him of a fair and impartial jury.

¶ 47 First, Frederick challenged prospective juror Fuller for cause at trial and complains on appeal that he should have been excused "because of a lack of citizenship and/or residence." Title 38 O.S.Supp.1997, § 28(A), provides:

> "All citizens of the United States, residing in this state, having the qualifications of electors of this state, who are of sound mind and discretion and of good moral character are competent jurors to serve on all grand and petit juries within their counties."

¶ 48 The Oklahoma Constitution provides: "[A]ll citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this state, are qualified electors of this state." *See* Okla. Const.Art.III, § 1. Since Appellant does not further claim or establish that Mr. Fuller, a retired officer of the United States Air Force, was not a citizen of the United States, his argument that Fuller should have been removed for "lack of citizenship" fails.

¶ 49 Mr. Fuller testified that his wife was an active duty member of the United States Air Force at Tinker Air Force Base and that he and his wife would continue living in Oklahoma indefinitely until his wife got orders from the Air Force to move elsewhere. The Oklahoma Supreme Court in *Box v. State Election Board of Okla.*, 1974 OK 104, ¶ 23, 526 P.2d 936, 940, said, "[R]esidence is acquired by actual presence in the state, *coupled with* the intention to remain there permanently or for an indefinite period." Mr. Fuller was a qualified juror in this case because he was a resident of Oklahoma County, Oklahoma, and intended to remain there for an indefinite period. Appellant used a peremptory challenge to excuse Mr. Fuller, and he therefore did not serve on the jury.

¶ 50 Appellant next complains that prospective juror Sharon Richardson should have been excused for cause because she was "in favor of" the death penalty, which she believed was a more appropriate punishment than life or life without parole for first-degree murder. When asked if she could envision any circumstances where a straight life sentence might be an appropriate sentence for murder, she responded, "I don't know that I could. I don't know that I could honestly say that life would be appropriate." She said that she would "lean further toward the death penalty," that the death penalty had a head start, that the death penalty would receive more consideration, and that she was firmly committed to a position that would not give the same consideration to a life sentence.

¶ 51 However, Ms. Richardson also stated that she could consider all three options. She said she would not automatically vote for a sentence of death, and she would vote for a life sentence if she thought it was appropriate. She said that although she might "lean toward" the death penalty in a murder case, she would consider all the options. Appellant exercised a peremptory challenge against Ms. Richardson, and therefore she did not actually sit on his jury. The decision to disqualify a prospective juror for cause rests within the sound discretion of the trial court, whose decision will be overturned only where an abuse of discretion exists. *Workman v. State*, 1991 OK CR 125, ¶ 5, 824 P.2d 378, 380, *cert. denied*, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992). The trial court did not abuse its discretion in declining to excuse these two prospective jurors for cause.

¶ 52 Appellant, in his reply brief, points out that in a recent first-degree murder case (subsequent to Frederick's 1998 trial and conviction) we said: "[E]ach juror stated he or she could consider all three punishments *equally*. That is all the law requires." *Malicoat v. State*, 2000 OK CR 1, ¶ 7, 992 P.2d 383, 393 (emphasis added), *cert. denied*, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000). Several prospective jurors in *Malicoat* said they "could consider all three punishments equally." *Id.* We find that the word "equally" in *Malicoat*, although it accurately described the answers of the prospective jurors referred to in that case, was not required by law. The statement, "That is all the law requires," is misleading because it implies the law requires that much. *Malicoat* cited the case of *Salazar v. State*, 1996 OK CR 25, ¶ 21, 919 P.2d 1120, 1127, *cert. denied*, 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 190 (1999), which said:

> " 'To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun.' *Carter v. State*, 1994 OK CR 49, ¶ 20, 879 P.2d 1234, 1244, *cert. denied*, 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995)."

¶ 53 Neither the *Salazar* case, nor the *Carter* case quoted in *Salazar*, contains the

word "equally." We correct the misstatement in *Malicoat* to the extent that it implies a prospective juror in a capital case must be able to consider all three punishments "equally." This correction does not effect the ultimate disposition of Malicoat's case, as the word "equally" was mere surplusage there and was more favorable to him than a more precise and accurate statement of the law would have been. Nor does the word "equally" used in *Malicoat* benefit Frederick, as it was handed down January 7, 2000, subsequent to Frederick's trial and conviction. Therefore, it was not in effect at the time of his trial, could not have applied to his case, and could not have been relied upon by him.

### Request for Additional Peremptory Challenges

 ¶ 54 Frederick also claims that the trial court improperly denied his request for two additional peremptory challenges that he would have used to excuse two of three prospective jurors that he considered "unacceptable": Ms. Tyson, Mr. Simonds, and Mr. Stampley. Appellant did not challenge these jurors for cause and has not shown that any disqualified juror actually sat on his case.

¶ 55 We held in *Ross v. State*, 1986 OK CR 49, ¶ 11, 717 P.2d 117, 120, *aff'd sub nom Ross v. Oklahoma*, 487 U.S. 81, 83–84, 108 S.Ct. 2273, 2276, 101 L.Ed.2d 80, 87 (1988):

"The record reflects that defense counsel challenged the prospective juror for cause, and when the court denied the challenge, defense counsel used a peremptory challenge. All of appellant's peremptory challenges were subsequently used; but as there is nothing in the record to show that any juror who sat on the trial was objectionable, we are unable to discover any grounds for reversal."

¶ 56 In their opinion affirming *Ross v. State*, the United States Supreme Court said: "None of the 12 jurors who actually sat and decided petitioner's fate was challenged for cause by defense counsel. . . . We conclude that petitioner has failed to establish that the jury was not impartial." *Ross v. Oklahoma*,

487 U.S. at 84, 86, 108 S.Ct. at 2276, 2277, 101 L.Ed.2d at 87, 88 (1988).[4]

¶ 57 We held in *Tibbetts v. State*, 1985 OK CR 43, ¶ 12, 698 P.2d 942, 946:

"The defendant challenged [a] juror for cause, was overruled, and used his last peremptory challenge to excuse her. The next juror drawn was a vehicle maintenance man for the City of Lawton who was acquainted with the policemen involved in the case. The appellant's claim is without merit as to the improper seating of the juror who was a maintenance man for the Lawton Police. He was adequately examined throughout his *voir dire*, and **the defense counsel was satisfied with him on the jury, for she failed to challenge him for cause; in fact, defense counsel 'passed him for cause.'**" (Emphasis added.)

¶ 58 See also *Myers v. State*, 2000 OK CR 25, ¶ 6–12, 17 P.3d 1021, 1026–28, *cert. denied*, —— U.S. ——, 122 S.Ct. 228, 151 L.Ed.2d 163 (2001). Appellant's third proposition is denied.

### FIRST STAGE ISSUES

### Transcript of Psychiatrist Admitted from Previous Trial

¶ 59 In Frederick's first trial, in 1992, a psychiatrist from Amarillo, Texas, Dr. Hugh Pennal, M.D., testified for the prosecution. He had examined Frederick in jail in Texas in 1989 and 1990 while Frederick was awaiting trial for the murder of Mr. Fox. By 1997, Dr. Pennal, due to a heart condition, was unable to testify in Oklahoma, or even to give a deposition in Texas. Both sides stipulated at Frederick's second trial that Dr. Pennal was unavailable, although Frederick continued to object to admitting Dr. Pennal's previous testimony. His testimony from the first trial was read to the jury in the second trial pursuant to 12 O.S.1991, §§ 2804(A)(4) and 2804(B)(1).

 ¶ 60 Appellant argues in the first subproposition of Proposition One that Dr.

---

**4.** See also *United States v. Martinez–Salazar*, 528 U.S. 304, 120 S.Ct. 774, 780–81, 145 L.Ed.2d 792 (2000), extending the holding in *Ross* to trials in federal courts.

Pennal's testimony should not have been read to the jury because, due to an *Ake* violation at the first trial,[5] he had no qualified psychiatrist to help prepare his counsel to cross-examine Dr. Pennal. Since it was stipulated that Dr. Pennal was not available at the time of the retrial in 1998, and he had testified and been cross-examined under oath in the previous trial in the same case, the court properly allowed a transcript of his previous testimony to be read to the jury at the retrial. Dr. Pennal's testimony was admitted at the retrial in strict compliance with the provisions of 12 O.S.1991, §§ 2804(A)(4) and 2804(B)(1). This section of the Evidence Code codifies a traditional exception to the hearsay rule. If a witness is not available due to death or physical or mental illness or infirmity, the witness's prior testimony is not excluded by the hearsay rule if the party against whom the testimony is now offered had an opportunity and a similar motive to develop testimony by direct, cross, or redirect examination. *Rogers v. State*, 1986 OK CR 104, ¶ 9, 721 P.2d 820, 823.

¶ 61 Appellant can no longer claim he was surprised by the testimony since the State could only present the verbatim transcript of Dr. Pennal's testimony presented over five years earlier. Appellant's claim that his counsel at the first trial was denied access to Dr. Pennal's files is not supported by the record. Appellant's trial counsel at the first trial, Bert Richard, who also represented Appellant at the second trial, had been allowed at the first trial to examine Dr. Pennal's entire file, and he conducted a highly effective cross-examination of Dr. Pennal for

bias. This cross-examination from the 1992 trial was read to the jury in the 1998 trial.

¶ 62 Also, Appellant had the benefit of testimony of attorney David Green at his second trial, who had been his attorney in Texas during the time he was examined by Dr. Pennal. He was familiar with Appellant's condition in 1989.

¶ 63 Counsel was not entirely deprived of expert advice at the original trial prior to the time he cross-examined Dr. Pennal because he had retained Dr. Philip Murphy, Clinical Psychologist, who had administered psychological tests to Frederick in 1992, including the MMPI-2.[6]

¶ 64 Dr. Pennal found Appellant did not have Multiple Personality Disorder and found that Appellant was malingering. Dr. Coons, the defense psychiatrist at the second trial, testified that he could not determine whether Appellant had Multiple Personality Disorder, did not believe Appellant was malingering, but could not rule out malingering. Thus, his findings did not directly contradict Dr. Pennal's findings. In fact, as discussed below, insanity was not successfully raised in this case, and if any error occurred here, it would clearly be harmless. We give great deference to the trial court's determination that Dr. Pennal's testimony was admissible at the retrial. *See Manuel v. State*, 1990 OK CR 80, ¶ 11, 803 P.2d 714, 716–17.

¶ 65 Appellant claims that he was surprised by the last minute motion to use Dr. Pennal's transcript. However, the State had filed the same motion June 5, 1997,

---

5. After the court in Oklahoma had continued the jury trial more than once by agreement of the parties, Appellant was twice given continuances for the purpose of obtaining a psychiatrist. He asked for the first of these continuances in January 1992 because his office was awaiting funds to hire a forensic psychologist or psychiatrist, and the court continued the trial until April 13, 1992. During this first continuance, Appellant obtained the services of a clinical psychologist, Dr. Philip Murphy. At an *ex parte* hearing before the trial court with defense counsel on April 2, eleven days before trial, Dr. Murphy advised the court that he was not an expert in Multiple Personality Disorder (MPD) and that the defendant should obtain the services of a Psychiatrist experienced with that disorder. The court granted the request for a second continuance until October 5,

1992, for that purpose. On September 25, ten days before the trial setting, counsel advised the court that the Psychiatrist he had obtained, Dr. Braun, would not be able to appear on the trial date due to a conflict in schedule, and could not even examine Frederick until late November, almost two months after the scheduled trial date. The trial court refused to continue the trial this time. Frederick's first conviction was reversed because he was denied assistance of a psychiatrist in violation of *Ake v. Oklahoma*, 470 U.S. 68, 82, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). *Frederick I*, 1995 OK CR 44, ¶ 31, 902 P.2d at 1099.

6. *Frederick I*, 1995 OK CR 44, ¶ 14 & n. 9, 902 P.2d at 1095 & n. 9.

before the Post-evaluation Competency Hearing, with a letter from Dr. Pennal's cardiologist, stating Hugh Pennal, who was born June 22, 1920, was undergoing treatment for cardiac arrhythmia and due to medical reasons should not testify or be cross-examined in a courtroom situation. His transcript had been admitted at the July 10, 1997, competency hearing. A similar motion was filed February 17, 1998, and hand delivered to defense counsel that day, with a similar letter attached, dated February 10, 1998, before the Jury trial which began February 23, 1998. Dr. Pennal's transcript was read to the jury on March 3, 1998. Appellant objected to the reading of the transcript on other grounds which had been previously stated, but not on the grounds of lack of notice. We therefore examine only for plain error. Since there was 14 days actual notice before the transcript was read, and Appellant had several months notice that Dr. Pennal, who was 77 years old, had a heart condition and could not travel or testify, we find the notice was adequate and there was no plain error. We find no reversible error in this subproposition.

### Proffered Hearsay Evidence of Dr. Pennal's Bias

¶ 66 Dr. Pennal lived and worked in Amarillo, Texas, and by 1998 had been retired for several years. Under Subproposition Two of Appellant's first proposition, he complains that he was not allowed to present evidence of Dr. Pennal's "law and order" or pro law enforcement bias by using evidence of Dr. Pennal's reputation in his community. Appellant was allowed to make an offer of proof, *in camera*, by conducting an examination of his witness, David Green, Public Defender for the 69th District, who had been Frederick's lawyer in Texas. During that examination, Green stated Dr. Pennal's "reputation" in the community was that "he rarely found anyone insane or incompetent." He recalled discussing this with Selman Hale, Joe Mar Wilson, and *possibly* Warren Clark, three private attorneys in Amarillo about ten years before. He also recalled Mike Merideth, an Assistant District Attorney, saying that if you wanted the defendant to be found competent, just have Dr. Pennal examine him.

¶ 67 However, Green also admitted, *in camera*, that the District Judge in the 69th Judicial District, Bill Sheehan, liked to appoint Dr. Pennal. He was asked, "Are you trying to lead the Court to believe that Judge Sheehan used Dr. Pennal all the time because he kind of liked him and he kind of had similar beliefs?" Mr. Green answered, "No I'm not trying to tell the Court that." Green said that Dr. Pennal got most of the appointments from Judge Sheehan during that time period that Green was aware of. A reasonable inference from Green's testimony would be that Judge Sheehan had confidence in the reliability of Dr. Pennal's psychiatric evaluations.

¶ 68 Mr. Green testified that he could not say that Dr. Pennal's findings were inaccurate. Appellant made no attempt to show the rate of malingering among criminal defendants who are examined for incompetence or insanity. Appellant's own expert, Dr. Coons, testified later that malingering "is more common amongst people who have been criminally prosecuted." Dr. Coons was then asked, "So faking is more common [among] those people who are facing criminal charges?" and he answered, "I would think so, yes."

¶ 69 Even if the hearsay comments quoted by Green from three or four Amarillo attorneys that in their experience Dr. Pennal "rarely found anyone insane or incompetent," could be considered, it would have little relevance in showing bias because there was no proffer of evidence, nor even a claim, that Dr. Pennal's evaluations were not accurate. Mr. Green's own experience contradicted any inference that Pennal's evaluations were not accurate. When asked if it were possible that Dr. Pennal's evaluations were correct, Green admitted, "Yes." The limited information provided by the offer of proof simply does not meet the relevancy requirements of 12 O.S.1991, §§ 2401 and 2402.

¶ 70 Mr. Green testified that he had only three or four clients, including Frederick, who had been examined by Dr. Pennal. Dr. Pennal had found one of those incompetent. He had not asked for a jury trial on compe-

tency for any of his clients found competent by Dr. Pennal. The one client who Dr. Pennal found incompetent was also eventually found to be incompetent by the court. Green did not know of any case where Dr. Pennal's findings had been contested and overturned by a jury.

¶ 71 Even if reputation evidence were admissible to prove bias, no foundation was laid to establish that Mr. Green was qualified to testify regarding Dr. Pennal's reputation. He did not live or practice in the same community where Dr. Pennal lived and practiced. Green lived in Dumas which was about 46 miles north of Amarillo. Green had moved there from Victoria in Southeast Texas and had just begun working as the Public Defender in January 1989, a few months before Frederick's arrest. He did not know of Dr. Pennal before 1989. Green had only met Dr. Pennal once before Pennal was appointed to examine Frederick and only remembers one case with Dr. Pennal after Frederick's case.

"It is the universal and well-settled rule that a discrediting witness must be acquainted with the character or reputation of the witness whom he is called to impeach among his neighbors or general associates, and that he is incompetent where his knowledge is confined to private reputation as existing among a few people." 98 C.J.S. *Witnesses* § 520 (1957).

¶ 72 The Oklahoma Evidence Code provides that credibility of a witness may be attacked by evidence in the form of opinion or reputation, but **only** if the evidence refers to "character for truthfulness or untruthfulness." 12 O.S.1991, § 2608. Extrinsic evidence, if relevant, is admissible to prove bias; however, Appellant cites no cases from any jurisdiction, and we have found none, holding that witness bias may be proven by hearsay or reputation.[7]

¶ 73 Thus, the trial court properly held that the proffered reputation evidence was not admissible on the issue of bias. Frederick was not denied an opportunity to present

proper evidence of witness bias, and we deny this proposition.

### Expert not Permitted to Testify about Amnesia in First Stage

¶ 74 Appellant complains in Subproposition 5(F) that the trial court refused to allow Dr. Coons, his psychiatrist, to testify in the first stage of his trial about his amnesia or "dissociative fugue." The court ruled that the expert was not claiming that this mental condition amounted to insanity under the statutory definition in Oklahoma, and therefore his opinion was not relevant to the first stage guilt or innocence issues. We held in *Frederick I*, 1995 OK CR 44, ¶¶ 16–26, 902 P.2d 1092, 1095–98, after Frederick's first trial, that he was entitled to a psychiatrist in both stages of trial. Dr. Coons testified that he could not say that Frederick was suffering from the mental disability that was suspected at the time of the first trial, Multiple Personality Disorder (MPD), which he says is now called Dissociative Identity Disorder (DID). He said he could not diagnose this disorder nor rule it out. Nor could he say that Frederick was incapable of knowing right from wrong. He impeached Dr. Pennal's testimony ruling out MPD by saying he did not think it could be ruled out in such a short time (ten weeks). When asked, "How many years does it take to make an accurate diagnosis of multiple personality disorder?" he said, "[P]atients are in the mental health system for six or seven years on the average before the diagnosis gets made." But then Dr. Coons admitted: "On the average, but you know, **that doesn't mean someone can't make the diagnosis from, you know, seeing the patient the first few times.**" (Emphasis added.)

¶ 75 Appellant claims "the mental health evidence [of amnesia] was material [in the first stage] in that it might have created a reasonable doubt of innocence or diminished capacity and a lack of malice that would not have otherwise existed." Proving lack of

7. This Court said in *Beck v. State*, 1991 OK CR 126, ¶ 15, 824 P.2d 385, 389: "While we must look to the common law in determining the scope and procedure regarding use of bias evidence for impeachment, we must also seek to conform this evidence to the criteria enacted through the Oklahoma Evidence Code."

memory would not prove lack of malice. *See Sellers v. State*, 1991 OK CR 41, ¶ 34, 809 P.2d 676, 686–87, *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991) ("Mere inability to remember an event, in and of itself, cannot establish automatism, since the relevant inquiry involves the accused's knowledge and control at the time of the conduct, not at the time of trial."). Not surprisingly, Appellant cites no Oklahoma cases. Oklahoma law does not provide for a diminished capacity defense except for the insanity defense and the intoxication defense, neither of which were established under Dr. Coons's testimony or any other evidence. In *Hooks v. State*, 1993 OK CR 41, ¶ 11, 862 P.2d 1273, 1277–78, *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994), we held that the trial court properly excluded the proffered testimony of Dr. Murphy, a clinical psychologist, that "it was his opinion that Hooks did not act with malice aforethought when he killed the victim," and that "Hooks had been in a delusional state and had acted in the heat of passion." We noted, the doctor's testimony "significantly omitted an assessment of Hooks' sanity, *i.e.*, whether, at the time of the murder, he had the mental capacity to distinguish right from wrong or to understand the nature and consequences of his acts." *Id.*, 1993 OK CR 41, ¶ 15, 862 P.2d at 1278.

¶ 76 In Frederick's case, his psychiatrist specifically testified that he was unable to determine Frederick's sanity or insanity, or whether Frederick knew right from wrong, at the time of the crime. Therefore, there was no error in the trial court's excluding opinion testimony offered by Frederick's psychiatrist in the first stage of trial that Frederick might have amnesia, but which did not purport to show insanity as a defense to a crime as defined in our law.

¶ 77 Subproposition 5(F) is denied.

### Admissibility of Confession

¶ 78 In Proposition Six, Appellant complains that the prosecution admitted in-criminating statements of Appellant prior to presenting substantial evidence that the deceased died as a result of a crime. Unfortunately, Appellant is confusing three separate principles of law: (1) the requirement that a confession be corroborated in some manner so that a defendant cannot be convicted solely on his confession, (2) the former "*corpus delicti* rule"[8] which we abolished with the case of *Fontenot v. State*, 1994 OK CR 42, ¶ 20, 881 P.2d 69, 77–78, and (3) the requirement that in a homicide case, the death of the victim and the fact that the defendant killed the victim must be proven independently beyond a reasonable doubt (21 O.S. 1991, § 693).

¶ 79 With regard to the first principle, corroboration of a confession, we said in *Short v. State*, 1999 OK CR 15, ¶ 34, 980 P.2d 1081, 1096, *cert. denied*, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000):

> "A confession is not admissible under Oklahoma law unless it is supported by 'substantial independent evidence which would tend to establish [its] trustworthiness.' [Citations omitted.] This standard does not require that each material element of the charged offenses be corroborated by facts independent of the confession, or that there be no inconsistencies whatsoever between the facts proven and the facts related in the confession."

In *Tilley v. State*, 1998 OK CR 43, ¶ 14, 963 P.2d 607, 612, we said:

> "However, each material element does not have to be corroborated by facts independent of the confession. *Rogers* [*v. State*, 1995 OK CR 8, 890 P.2d 959, 975, *cert. denied*, 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995) ]. In fact, inconsistencies between the facts proven and the facts related in the confession may exist, so long as the inconsistencies do not overwhelm the similarities. *Id.*"

¶ 80 In Frederick's case, the State presented sufficient corroborating evidence to show the trustworthiness of his confession. For

---

8. Of course, the *corpus delicti,* the fact that the crime has actually been committed by someone, must be proven in every criminal case. This is not to be confused with the "*corpus delicti* **rule**"

which pertained to the admission of confessions. *Fontenot,* 1994 OK CR 42, ¶ 19 n. 9, 881 P.2d at 77 n. 9.

example, Frederick was the last person seen with Beck before he disappeared; Frederick filled out a motel registration slip that same night listing Beck's pickup; the pickup with no tag was found at Mr. Fox's house, and Fox's car was missing; Frederick stayed at another motel and listed Fox's car on the registration slip; Frederick had possession of Fox's car in Amarillo; property stolen from Beck was found in Fox's car; property stolen from both Beck and Fox was found in Frederick's motel room in Amarillo; and Frederick's confession accurately described the death of Beck and the location and position of his dead body two months before it was found, to-wit: (1) uncovered, (2) not buried, (3) in an open field, (4) near Spencer, Oklahoma. Further the findings of the pathologist, Dr. Jordan, corroborated Frederick's confession in that Beck died from homicide, not natural causes or accident. We find that Frederick's confession was corroborated and properly considered by the jury.

¶ 81 Concerning the second principle, the former *"corpus delicti* rule," we said in *Fontenot,* 1994 OK CR 42, ¶¶ 19–20, 32, 881 P.2d at 77–78, 80:

"Although the relatively simple question is whether Fontenot's confession was sufficiently reliable to support his convictions, this Court in prior opinions has obscured the proper method of resolving the issue. We have previously utilized together two separate and contradictory analyses when addressing whether a defendant's confession was competent to support a conviction. First, we determined whether the State provided substantial, independent evidence of the *corpus delicti* of the crime charged. Then, we determined whether the State provided independent evidence substantially corroborating the confession. [Citations omitted.] If the State presents independent evidence of the *corpus delicti* as well as additional corroborating evidence, the confession is deemed competent evidence upon which a conviction may be based. **We now reject the *corpus delicti* line of analysis** and reaffirm this Court's prior adoption of the standard which re-

quires only that a confession be supported by 'substantial independent evidence which would tend to establish ... [its] trustworthiness....' *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954)...." (Emphasis added.) (Footnote omitted.)

. . . .

"To summarize, we now hold that whether an accused's confession is competent to support a conviction depends not upon whether substantial evidence of the *corpus delicti* of the crime has been introduced, but upon whether the confession is trustworthy. A confession may be considered trustworthy if it is corroborated by substantial, independent evidence. Under Oklahoma statutory law, the only fact which may not be proven by an accused's properly admitted confession is the fact that a death occurred." (Footnotes omitted.)

¶ 82 After the ruling in *Fontenot,* it is clear that a confession, once properly corroborated pursuant to the rule announced in *Short, supra,* may be used to establish every element of the crime except the death itself. In this case, there is substantial evidence of the death, and Frederick's confession alone, even if it were the only evidence of his guilt, would be sufficient evidence, if believed by the jury, that the homicide was committed by Appellant.

¶ 83 Concerning the third principle, 21 O.S.1991, § 693, requires that in a homicide case "the death of the person alleged to have been killed" and "the fact of the killing by the accused" must be proven independently beyond a reasonable doubt.[9] This statute applies primarily to cases where the body of the deceased murder victim has not been found. Of course, it is easy to prove the death of the victim when the body has been found. The relevant portion of § 693 only requires independent evidence of a death, which is abundant in this case. Proposition Six is denied.

**9.** Section 693 is not a "super" *"corpus delicti* rule." For detailed discussion of the applicabili-

ty of this section, see footnote 15 of the *Fontenot* decision, *supra.*

### Sufficiency of Evidence in First Stage

¶ 84 In Proposition Seven, Frederick claims that the State failed to present sufficient evidence to prove beyond a reasonable doubt that the death of the victim was unlawful and accomplished with malice aforethought. Whenever the sufficiency of the evidence is challenged on appeal, this Court will apply the test set out in *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–204:

"In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court held that due process requires a reviewing court to determine 'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'"

Further, this Court will accept, on review, all reasonable inferences and credibility choices that tend to support the jury's verdict. *See e.g., Roldan v. State*, 1988 OK CR 219, ¶ 8, 762 P.2d 285, 287.

¶ 85 First Degree Murder is defined in Title 21 O.S.Supp.1989, § 701.7(A):

"A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof."

¶ 86 Considering the facts we have set forth in this opinion and which appear in the record, we find that the proof of Frederick's guilt was not only sufficient, but overwhelming. We find that any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Spuehler, supra*. We therefore deny Appellant's Proposition Seven.

### Victim's Hospital Records

¶ 87 Appellant complains in his eighth proposition of error about the trial court's rulings on admission and exclusion of evidence. He complains in Subproposition 8(A) that the trial court excluded certain Veterans Administration Hospital records of the victim of this homicide, Brad Beck. Appellant sought to examine the records, despite the physician-patient privilege, to inquire into the victim's history of drug and alcohol abuse, mental health, and suicide attempts some distance in the past. Some of the records were reviewed by the state medical examiner for purposes of identification of the deceased by dental work and old bone fractures that were still visible in the skeletal remains.

¶ 88 The court examined the records *in camera* and resealed them in case they were needed for review on appeal. He ruled that they contained no matters relevant to the defense of Appellant. The court allowed counsel to inquire as to any use of drugs or alcohol that occurred in the days immediately preceding the victim's murder. The court however refused to allow counsel to discuss or present evidence of drug and alcohol abuse, mental health, and suicide attempts that had allegedly occurred several months or years prior to the murder.

¶ 89 Appellant alleged that the sealed records would reveal heroin use by the victim some twelve years before his death, an attempted suicide about eleven years before his death, and treatment for a Librium overdose approximately three months before his death. Appellant admitted he had no evidence that the overdose was a suicide attempt. Admission of the victim's medical records showing such events in the past, which could have no relevance to the cause of death of the decedent, would have been improper. *Duvall v. State*, 1991 OK CR 64, ¶¶ 11–12, 825 P.2d 621, 627–28, *cert. denied*, 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992) (prior drug conviction of murder victim not admissible).

¶ 90 We find that the contents of the sealed medical records of the murder victim in Frederick's case were not relevant to any issue relating to Frederick's guilt or innocence, and therefore the trial court properly restricted evidence about the privileged matters which may have been revealed in the records. *See Bernay v. State*, 1999 OK CR 37, ¶ 26, 989 P.2d 998, 1008, *cert. denied*, 531 U.S. 834, 121 S.Ct. 92, 148 L.Ed.2d 52 (2000); 43A O.S.Supp.1997, § 1–109 (All medical rec-

ords and all communications between physician or psychotherapist and patient are both privileged and confidential.).

### Motion to Suppress Evidence

¶ 91 Frederick complains in Subproposition 8(B) that his arrest in Amarillo, Texas, for the murder of Mr. Shirley Fox was illegal and therefore any statements and physical evidence obtained pursuant to that arrest should have been suppressed by the trial court in Oklahoma. Appellant claims generally that there was no probable cause for his arrest. The court conducted a *Jackson v. Denno* hearing and suppression hearing by reviewing the transcribed testimony of three officers who had testified at the original trial in 1992. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). We find, from the testimony presented, including Frederick's possession of the car that had been taken from Mr. Fox at the time of his murder, that the trial court did not abuse its discretion in finding that Frederick's arrest for the murder of Mr. Fox was legal and that no evidence flowing from that arrest should have been suppressed.

¶ 92 When the police, with Frederick in their custody, drove past Fox's car, which was surrounded by police cars, on the way to the Amarillo Police Department, Frederick initiated a conversation by asking "if the girls that he had loaned his vehicle to had gotten busted for speeding or something?" Officer Oakley then asked Frederick if that was his car and "He said that it was." Frederick then volunteered that "he had bought the car a few nights earlier." Police later found a pair of Beck's coveralls, his tan jean jacket, and his boots in Fox's car. Inside the pocket of the coveralls was a receipt with Beck's name on it.

¶ 93 Although Frederick was in custody and had not yet been advised of his rights, the statements volunteered by him were admissible and not given in response to interrogation. *Miranda v. Arizona*, 384 U.S. 436,

444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966).[10] Introduction of the response to the single question, "if that was his car?" was harmless error as Frederick had just volunteered that it was "his vehicle." Otherwise, the motion to suppress was properly overruled by the trial court, and the statements and physical evidence were properly admitted. This subproposition is denied.

### ISSUES IN FIRST AND SECOND STAGES ALLEGED VICTIM IMPACT EVIDENCE

¶ 94 In Subproposition 8(D), Frederick complains that victim impact evidence was introduced in the guilt-innocence stage over a "partial objection," and in the second stage "when the first stage evidence was incorporated in the second stage," and also when evidence was presented that Mr. Shirley Fox was disabled. Actually, no victim impact evidence, per se, was introduced. The evidence that Appellant characterizes as victim impact evidence was admitted because it was relevant to other issues. 12 O.S.1991, §§ 2401, 2402. The physical disabilities of Brad Beck were admitted to prove that he was not capable of walking without his cane to the field where his body was found. This was relevant to show that Appellant drove Beck's body to the field in Beck's pickup and took his cane and pickup to Texas. Evidence that Beck's cane was found with other identifying property abandoned near Texline, where Frederick also abandoned Beck's pickup, connected the cane to Frederick and rebutted his story that Beck had said he was going to hitchhike to Mexico.

¶ 95 Beck's close relationship with his cousin Terri Smith, and Beck's plans to buy his own home, were relevant facts to rebut Frederick's statement to police that Beck told him he was going to "hitchhike to Mexico [without his cane] and drop off the face of the Earth." The fact that Beck was a proud, decorated Vietnam veteran was incidental to proving the medals belonged to

---

**10.** *Miranda* warnings are only required prior to "custodial interrogation." The Supreme Court said in *Miranda:* "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custo-

dy.... The mere fact that he may have ... volunteered some statements on his own does not deprive him of the right to refrain from answering any ... inquiries...." *Id.*

Beck, that he would not have given his medals to Frederick, and that Beck's medals found in Frederick's motel room were therefore stolen.

¶ 96 Evidence, admitted in the second stage of the trial, that Mr. Fox was 76 years old, had only one eye, and lived alone was relevant to show the type of person Frederick chose to kill: a handicapped man who lived alone among his keepsakes, who no one would miss immediately, and who was not able to defend himself. These characteristics of Mr. Fox paralleled those of Bradford Beck. A comparison of these victims in the second stage was highly relevant to show that Frederick preyed upon defenseless weak men who had a vehicle and other valuables to steal, and who would not be missed for a day or two, so he could escape with their property. This evidence demonstrated that Beck's murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution for stealing Beck's property. It also proved a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. Subproposition 8(D) is denied.

## RULINGS ON EVIDENCE—FIRST AND SECOND STAGES

¶ 97 In Subproposition 8(E), Frederick complains that Terri Smith was "improperly allowed to give hearsay testimony ... over objection." Appellant does not specify the language he complains of, other than by page numbers. On page 1103 of the transcript, the first hearsay objection was sustained. Then the prosecutor asked: "Now, did you ever find out in one of your phone calls to your house that somebody, that a stranger was at your house?" Defense counsel said, "Judge, she's asking for a hearsay response, just a different way." The judge correctly responded, "She may or may not be. I don't know." Smith was then allowed to answer, and her answer was, "Yes." After conference at the bench, the prosecutor asked: "And who told you about that?" She properly answered, "I heard—I heard the voice in the background." This was clearly testimony based on personal perception, not hearsay.

¶ 98 The prosecutor then asked, "So what did you say?" Smith answered, "I told Bradford, I said, who is that? And he said, 'Jeffrey.' I said I don't know him. I said, get that son of a bitch out of my house." Smith was later asked, "What did Bradford say?" and she answered, "That he would." The answer "Jeffery" was not objected to. Although it was hearsay, it was admissible hearsay under the first exception to the hearsay rule: "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." 12 O.S. 1991, § 2803(1). The answer, "That he would," was not objected to. It was hearsay, but it was admissible hearsay under the third exception to the hearsay rule: "A statement of the declarant's then existing state of mind ... such as ... plan...." 12 O.S.1991, § 2803(3). The statements of Smith to Beck were not objected to and were not "offered in evidence to prove the truth of the matter asserted." 12 O.S.1991, § 2801(3). There was no plain error, and this part of Subproposition 8(E) is denied.

¶ 99 Continuing under Subproposition 8(E), Frederick complains that Terri Smith was "improperly allowed to give ... a personal opinion that '[t]hat guy went ahead and killed my cousin,'" over objection. Appellant's brief then states, "The trial judge failed to rule on the latter objection, trial counsel failed to insist on a ruling, and no admonishment was requested or given." However, Appellant in his appeal brief has failed to state a provision of the evidence code that he relies on, or to cite *any* authority as required by Rule 3.5, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001). The characterization that the statement was a "personal opinion" is insufficient to specify a violation of the evidence code, particularly when opinion testimony by a lay witness in certain circumstances is specifically authorized by 12 O.S.1991, § 2701. We will examine for plain error only.

¶ 100 The prosecutor had asked the question, "Now did you end up spending Thanksgiving [in Carlsbad, N.M.] with your moth-

er?" Smith answered, "Yes, I went ahead and spent Thanksgiving with mom—because nothing I could have done when I come back here anyway—because everything had happened. That guy went ahead and killed my cousin." Defense counsel said, "Judge, object." Counsel did not specify the basis of her objection. The court said, "Wait just a minute, ma'am. Just listen to what she asks. Go ahead. I know you're nervous. Just relax a little bit. Go ahead, Ms. Caswell." The judge apparently treated the objection as an objection to the "volunteered" or "non-responsive" answer, admonished the witness appropriately, and therefore did not consider a further ruling necessary. After the admonishment, trial counsel made no further objection or request of the court. As Appellant admits, "trial counsel failed to insist on a ruling, and no admonishment [to the jury] was requested or given." We presume trial counsel was satisfied with the court's admonishment of the witness. We find no plain error and deny this part of Subproposition 8(E). *Simpson v. State*, 1994 OK CR 40, ¶ 12, 876 P.2d 690, 695.

¶ 101 Next, still under Subproposition 8(E), Appellant complains of hearsay in the testimony of Dallam County Deputy Bruce Scott in the **second stage** of the trial. Deputy Scott testified that he was dispatched to the scene of Mr. Fox's homicide on November 16, 1989, where he met with the municipal judge of Texline and a grocer from across the street, who was also an Emergency Medical Technician (EMT). They told him a renter had gone to see Mr. Fox and saw blood in his foyer, and that the renter then went to get the EMT. The EMT told Scott that he saw the blood also. At this point Frederick's trial counsel objected and said, "This is all based on hearsay information. I move to strike." The prosecutor said, "Not being offered to prove the truth of the matter," and the court said, "Overruled. Go ahead, sir." Scott further testified that the EMT told him he then put on some gloves and went in the house and found Mr. Fox's body. The EMT told Scott that no one else had gone in the house. There was no further objection. Scott then testified that he asked another deputy to secure the scene with barrier tape and he personally entered

the house, did a quick walk-through, then photographed everything before anything was moved or touched. The judge, the renter, and the EMT did not testify.

¶ 102 The trial court erred in overruling the motion to strike inadmissible hearsay as to the statement immediately preceding the objection-that the EMT told Scott that he saw blood also. This degree of repetition of details was not necessary to explain Scott's subsequent actions, and therefore we cannot say the testimony was clearly not offered to prove the truth of the matter asserted. Objection to any earlier hearsay was waived, as an objection must be taken immediately. There were no objections to the EMT's further statements that he had put on gloves, gone into the house, and found Mr. Fox's body and that no one else had gone into the house after that. Since Deputy Scott went into Mr. Fox's house and personally saw the blood and the body referred to in the hearsay statement, and in view of the overwhelming evidence of Frederick's guilt, including a confession, the error in admitting the hearsay was harmless beyond a reasonable doubt. This part of Subproposition 8(E) is denied.

¶ 103 Appellant complains that Scott was allowed to testify that Fox and Frederick knew each other. This was not objected to, but rather was stipulated to, at trial. According to a discussion at the bench it was revealed that a phone bill which had been recovered from Frederick's Amarillo motel room showed phone calls from Nadine Forster's (Frederick's second wife) phone in Clayton, N.M., to Fox's phone number in Texline, Texas, and to Frederick's previous wife's phone number in Okmulgee, Oklahoma. Defense counsel said she had not been shown the phone record, but the prosecutor said it had always been in her file which had been made available to defense counsel. Defense counsel examined the phone record during the lunch recess, and admitted after lunch that the phone record showed initials by her co-counsel, Burt Richard. Defense counsel did not want the records admitted into evidence because, as she said:

"They have other things in them, like they reflect phone calls from Clayton, New Mexico to Okmulgee, Oklahoma, during the time frame [he] has his fugue state." The prosecutor added, "He was calling his first ex-wife from there during the time he claims he doesn't have memory of that stuff." The parties agreed that Scott could testify that Earl Frederick knew Mr. Shirley Fox during his lifetime. By making this stipulation, defense counsel wisely kept the phone records from being admitted into evidence. This was not error.

¶ 104 Officer Bell testified that Paul Encenia had been brought in for questioning based on Frederick's accusation that Paul killed Mr. Fox. Appellant complains that Bell was allowed to testify that when Paul saw Frederick in the jail he confronted Frederick and said, "Hey man, why are you telling all those lies on me. I haven't done nothing." Appellant did not respond. This statement made in Frederick's presence was properly admitted, not for the truth of the matter asserted, but to explain Frederick's subsequent confession. Later that day, Frederick sent for Officer Bell and confessed that he alone had killed Fox, and Paul had nothing to do with it. Admission of Encenia's statement was not error.

¶ 105 Appellant also complains that numerous physical items of evidence were admitted in the **second stage** that were evidence of the unadjudicated Fox homicide or lacked a proper chain of evidence: a hammer, a lift of a shoe print from a metal covered address book, a shotgun and coin sets recovered in Amarillo, and a motel registration slip from the XIT Ranch Motel in Dalhart dated November 14, 1989. These exhibits were all evidence of the murder of Mr. Fox. The only one of these items objected to at trial on the basis of chain of custody was the shotgun. We find no error in admitting the shotgun. The Dallam County Sheriff's Office had picked it up from the Amarillo Special Crimes Unit. Frederick had told the officers he had sold the gun and coins in Amarillo for $200. Sheriff Little had already testified, without objection, that the shotgun and coin sets had belonged to and were taken from the home of Shirley Fox. Nor does

Appellant claim on appeal that admission of Sheriff Little's testimony was error. All items mentioned under this subproposition were sufficiently identified. Any weakness in chain of custody goes to the weight to be given to the evidence and does not prevent admissibility. *Brown v. State*, 1998 OK CR 77, ¶ 58, 989 P.2d 913, 929. Evidence of unadjudicated crimes is admissible if relevant to prove aggravating circumstances in the penalty stage of death penalty cases. Appellant admits elsewhere in his brief that this is settled law in our State. See discussion of Propositions 12(Q) and 11(B) herein. There was no plain error.

¶ 106 Deputy Scott testified that he compared the footprint lift and the shoes Frederick was wearing and said, "They appeared to me to be a match." There was no objection to Scott's testimony at trial. On appeal, Frederick complains that Scott's opinion was based on inadmissible hearsay from an FBI report, and Scott's qualifications to render an opinion were not established. Appellant states, "Trial counsel made a hearsay objection to the footprint comparison before Scott testified, but failed to object at the time his opinion was offered." Actually, trial counsel's objection was to Scott making any reference to the FBI report, since the FBI agent was not present to testify. Trial counsel was successful in keeping out any testimony about the FBI report. Since there was no contemporaneous objection to Scott's comparison testimony, we examine for plain error only. His testimony was proper under 12 O.S.1991, § 2701, as a lay opinion which was "(1) Rationally based on the perception of the witness; and (2) Helpful to ... the determination of a fact in issue." We made a similar finding in *Trice v. State*, 1993 OK CR 19, ¶ 31, 853 P.2d 203, 213–214, *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993):

"Investigators took a picture of a bloody footprint found at the crime scene. Officer Wortham later placed the shoes, found in the storage shed, on a copy machine and made photocopies of the soles. The officer then compared the photo of the soles of the shoes with the photo of the footprint, and testified at trial that they "were consis-

tent." Although the record does not support the conclusion that Officer Wortham was an expert in the field of shoe print comparisons, the testimony concerning the shoe print was rationally based on the officer's observation and perceptions and was helpful in the determination of a fact in issue. Thus, it was admissible under 12 O.S.1981, § 2701."

Frederick's shoe print, which was found inside Mr. Fox's house, corroborates Frederick's confession that he, "Jeff," entered the house and killed Mr. Fox. This is not plain error. Subproposition 8(E) is denied.

## AGGRAVATING CIRCUMSTANCES

### Aggravating Circumstances Alleged Upon Retrial

¶ 107 In his eleventh proposition Appellant alleges that the State was barred from re-alleging the "avoiding lawful arrest" aggravating circumstance at the retrial because a demurrer was sustained to this same aggravator by the trial court in the original trial. Appellant cites the United States Supreme Court case of *Bullington v. Missouri*, 451 U.S. 430, 446, 101 S.Ct. 1852, 1862, 68 L.Ed.2d 270, 283, (1981) (holding that a defendant sentenced to life imprisonment by a capital sentencing jury cannot later be re-sentenced to death if his conviction is reversed and he is retried for the same offense). *Bullington* does not apply to Frederick's case because Frederick was not sentenced to life imprisonment at his first trial, but was sentenced to death in both trials. *See Frederick I*, 1995 OK CR 44, ¶ 1, 902 P.2d 1092, 1093.

¶ 108 Appellant ignores the United States Supreme Court case of *Poland v. Arizona*, 476 U.S. 147, 148, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) which distinguishes the *Bullington* decision. We adopted and followed the holding of *Poland* in *Salazar v. State*, 1996 OK CR 25, ¶¶ 13–17, 919 P.2d 1120, 1126. Appellant acknowledges *Salazar*, but tries to distinguish it from his case.

¶ 109 In *Poland* the sentencing judge at the first sentencing hearing had found that one aggravating circumstance of "pecuniary gain" was not supported by the evidence,

erroneously believing that the "pecuniary gain" circumstance was limited to contract killings, but imposed the death sentence based on evidence of a second aggravator, "especially heinous, cruel or depraved." The Arizona Supreme Court found the first aggravator was valid and supported by sufficient evidence, but that there was insufficient evidence of the second. Upon remand, the trial court found both aggravators were supported by the evidence and again imposed the death sentence. Upon the second appeal, the Arizona Supreme Court sustained the death penalty based upon the "pecuniary gain" aggravator, although they again found the evidence did not support the "especially heinous, cruel or depraved" aggravator. This decision was appealed to the United States Supreme Court where the death penalty was affirmed.

¶ 110 So long as the jury at the previous trial found the existence of at least one aggravating circumstance beyond a reasonable doubt, the "slate is wiped clean." *Poland*, 476 U.S. at 157, 106 S.Ct. at 1756, 90 L.Ed.2d at 133. For purposes of a retrial, we see no significant difference whether at the first trial the State failed to allege a second aggravating circumstance, whether the jury failed to find the second aggravating circumstance beyond a reasonable doubt, or whether the court sustained a demurrer to the second aggravating circumstance. If the jury found at least one aggravating circumstance beyond a reasonable doubt and returned a verdict of death in the first trial, and the case is remanded for retrial or re-sentencing, the State may allege any aggravating circumstance or circumstances at the subsequent retrial or re-sentencing, whether or not that same aggravator was alleged, dismissed, or rejected at the first trial. If the sentencing jury (or sentencing court if jury is waived) upon retrial or re-sentencing finds the existence of any aggravating circumstance, or circumstances, beyond a reasonable doubt and that it outweighs any mitigating circumstances, the death penalty may be imposed.

¶ 111 The State was not barred from re-alleging the "avoiding lawful arrest" aggrava-

ting circumstance at the retrial. Proposition 11(A) is denied.

### Sufficiency of Evidence to Support Aggravating Circumstances

¶ 112 Appellant makes two arguments in his Proposition 11(B) that the evidence admitted at trial was insufficient to prove the "avoiding lawful arrest" and "continuing threat" aggravating circumstances.

■■■ ¶ 113 His first argument is that the use of evidence of the unadjudicated murder in Texas to support the aggravating circumstances was unconstitutional-an argument that he admits we have consistently rejected. See his Proposition 12(Q) below. *Paxton v. State,* 1993 OK CR 59, ¶ 33, 867 P.2d 1309, 1321–1322, *cert. denied,* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994); *Johnson v. State,* 1987 OK CR 8, ¶ 33, 731 P.2d 993, 1003, *cert. denied,* 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987), *overruled in part on other grounds by Green v. State,* 1993 OK CR 30, ¶ 9, 862 P.2d 1271, 1273.

¶ 114 The overwhelming proof that he murdered Mr. Fox in Texas, only three days after he killed Mr. Beck in Oklahoma, using a chillingly parallel *modus operandi*—first gaining their trust while using false identities, intending to steal from each of these handicapped acquaintances their vehicle and property, to extinguish their lives, and to get away with it, establishes beyond a doubt that his purpose was to avoid arrest or prosecution for these thefts and that he would probably continue to commit similar criminal acts of violence against society. He had already stolen the birth certificate of Michael Don Smith to help him establish his next identity. His psychiatrist, Dr. Coons, was asked about the Appellant having this birth certificate: "[W]ould that be important for you to know in trying to decide whether he actually has MPD or whether that's another name he's getting ready to start using?" Dr. Coons said: "Well, I'm not really sure. Certainly there is a possibility he may be using aliases."

■■■ ¶ 115 His second argument is that "the continuing threat aggravator duplicates the avoiding lawful arrest aggravator and is invalid." He duplicates this second argument in Proposition 12(M) below under the heading "Duplicative Aggravation Evidence"—where he admits his argument is contrary to clear authority—and we reject it here also. *Robedeaux v. State,* 1993 OK CR 57, ¶ 79, 866 P.2d 417, 434–435, *cert. denied,* 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994).

■■■ ¶ 116 Appellant correctly states that the statutory aggravating circumstance that "[t]he murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution," focuses on the state of mind of the defendant. He also correctly states that this aggravator requires a predicate crime, separate from the murder, for which the defendant has a "purpose" to avoid arrest. However, he places too much emphasis on the sequence of events. He states, "Importantly, the record evidence did not indicate whether the deceased was killed before or after his property was taken." He cites to the transcript where defense counsel asks Officer Bell, "So you have nothing from him [Frederick] that tells you in what order things happened, the taking of the possessions and then killing Mr. Beck or the killing of Mr. Beck and then the taking of the possessions?" However, the proof of this aggravator does not depend on the precise order of events related by a defendant. We discussed this recently in *Wackerly v. State,* 2000 OK CR 15, ¶¶ 42–43, 12 P.3d 1, 14–15, *cert. denied,* 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001):

> "It is also argued that the State failed to prove beyond a reasonable doubt that Appellant intended to commit murder for the purpose of preventing or avoiding lawful arrest. This Court has held that a defendant's intent is critical to a determination of whether he killed to avoid arrest or prosecution. [Citation omitted.] We have further noted that 'as in other areas of criminal law, the defendant's intent can be proved by circumstantial evidence.'" [Citations omitted.]
>
> . . . .
>
> "It is not clear from the facts of this case whether Appellant intended to kill his victim to facilitate the robbery or whether he

killed his victim to avoid arrest for the robbery. There is some circumstantial evidence that Appellant was interested in avoiding detection for this crime.... Because Appellant did not disguise his identity, the victim could have identified him after the robbery. Accordingly, this Court finds that the evidence excludes every reasonable hypothesis except that Appellant killed to avoid arrest."

¶ 117 Likewise, Frederick had the clear intent to steal property from Brad Beck, who, if left alive, could immediately report the crime and then identify Frederick when he was caught. To improve his chances even further of avoiding arrest, Frederick hid Beck's body in a field where it would not be found immediately. And if any doubt remains about his purpose in killing Beck, he repeated this scheme three days later when he killed Mr. Fox in Texas, and stole his property. When this was revealed in the second stage of the trial, the jury was free to consider that he had repeated his grizzly procedure for his own personal gain just three days after killing Mr. Beck.

¶ 118 We reject Appellant's eleventh proposition, and we find that any rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found, as did this jury, the presence of both of these aggravating circumstances beyond a reasonable doubt. *Powell v. State*, 1995 OK CR 37, ¶¶ 67, 71, ¶ 3, 906 P.2d 765 of Order Granting Rehearing, 906 P.2d 765, 784, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996); *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

## PHOTOGRAPHS OF HOMICIDE VICTIMS

¶ 119 In his fourth proposition, Appellant complains that two (2) photographs of Brad Beck admitted in the first stage of trial, and seven (7) photographs of Mr. Shirley Fox and a crime scene diagram of his house showing a blood trail in red ink, admitted only in the second stage of trial, were "highly prejudicial and inflammatory." He also complains that the photographs were duplicitous

and showed "the degree of decomposition present."

¶ 120 The two photographs of Beck were taken of him as he was found in an open field, with his body unmoved and apparently untouched. These photographs are the only ones which showed "decomposition." They are not taken close up, but show Beck's entire body, still clothed in blue jeans. They corroborate the confession of Frederick that "Jeff" had killed Beck in Oklahoma and left his body in an open field near Smith's house, uncovered, and not buried.

¶ 121 The pictures of Mr. Fox were taken a couple of days after his death and do not show decomposition. Some of the pictures show his body at the crime scene. Others of the pictures show close-up views of wounds to his head and face after the blood had been washed away and some hair had been shaved from his head to better reveal the wounds. None of the photographic exhibits show any autopsy incisions or sutures. Each picture shows a different view of the wounds or of the crime scene and there is no unnecessary duplication.

¶ 122 Appellant complains that Juror Norman became ill during the prosecutor's opening statement in the second stage because the statement included a very graphic description of the brutal death of Mr. Shirley Fox. However, this was not related to the photographs of Mr. Fox, because the juror had not seen them at that time.

¶ 123 We said in *Bernay v. State*, 1999 OK CR 37, ¶ 18, 989 P.2d 998, 1007, "This Court has consistently held the test for admissibility of a photograph is not whether it is gruesome or inflammatory, but whether its probative value is substantially outweighed by the danger of unfair prejudice." The photographs in this case depict the crime scene and the wounds of the victim, and proof of the *corpus delicti*. *Nguyen v. State*, 1988 OK CR 240, ¶¶ 11–12, 769 P.2d 167, 170–71 (*cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989), *overruled in part on other grounds by Green v. State*, 1993 OK CR 30, 862 P.2d 1271, 1273.) They are probative evidence of the death of the victims. 22 O.S.1991, § 693. In the second

stage these photographs were highly relevant to support the aggravating circumstance that there is a probability that Frederick would commit criminal acts of violence that would constitute a continuing threat to society. In this case, the probative value of the photographs and the crime scene diagram were **not** substantially outweighed by the danger of unfair prejudice, and therefore Proposition Four is denied.

## JURY INSTRUCTIONS

### Settlement of Instructions before Reading to Jury

¶ 124 Appellant complains in the first subproposition of Proposition Nine that the trial court, in order to save time, failed to conduct a conference to settle the first-stage jury instructions before they were read to the jury. Defense counsel objected and moved for a mistrial, which was denied. Although the court had considered the defendant's requested instructions, and granted some of them, error occurred. We have considered this same error in other cases. We said in *Wooldridge v. State,* 1990 OK CR 77, ¶ 10, 801 P.2d 729, 731–35, construing 22 O.S.1991, § 831(5):

"In *Cody v. State,* [1961 OK CR 43] 361 P.2d 307 (Okl.Cr.1961), we held that when the trial court refuses to allow defense counsel to be heard on the merits of the instructions, this court 'will carefully scrutinize the instructions given, and if it [finds] that the trial court has omitted to instruct fully and correctly as to every principle of law applicable to the case,' then the verdict must be set aside and a new trial ordered. *Id.* at 323. Previously we have held that under certain circumstances, the resulting error may be harmless where no prejudice results to the defendant." (Citations omitted.)

¶ 125 We have carefully scrutinized the propositions in Frederick's appeal relating to instructions, and we find that the jury was properly instructed on all relevant points of law and that the error in not settling the instructions with counsel was harmless in this case. However, we emphasize once again the language of *Jenkins v. State,* 80

Okl.Cr. 328, 161 P.2d 90 (1945), quoted in *Wooldridge,* 1990 OK CR 77, ¶ 9, 801 P.2d at 732:

"We believe that the administration of justice would be greatly promoted by the recognition on the part of the trial court of the constitutional and statutory right of a defendant to be heard upon questions of law, as well as upon questions of fact, and that thereby the reversal of many cases would be avoided, and much time and expense would be saved to the State. Experience teaches us that even the wisest and best men are sometimes mistaken in their views. It matters not how able and learned a judge may be, he cannot always, without the assistance of counsel, prepare instructions which will fully and correctly present all the issues involved in a case to a jury."

¶ 126 We find that no prejudice resulted to Frederick, and this subproposition is denied.

### Voluntary Intoxication Defense

¶ 127 Appellant argues in Subproposition 9(A) that the trial court should have instructed on the lesser offense of First Degree Manslaughter. Appellant argues that First Degree Murder is reduced to First Degree Manslaughter by sufficient evidence of intoxication.

¶ 128 The level of intoxication required to justify voluntary intoxication instructions was defined in *Crawford v. State,* 1992 OK CR 62, ¶ 53, 840 P.2d 627, 638 where we said:

"By statute, voluntary intoxication is not a defense to criminal culpability. 21 O.S. 1981, § 153. However, we recognize an exception to this rule where the accused was so intoxicated that his mental abilities were totally overcome and it therefore became impossible for him to form criminal intent."

¶ 129 We said in *Jackson v. State,* 1998 OK CR 39, ¶ 67, 964 P.2d 875, 892, *cert. denied,* 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999): "A defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are over-

come...." No evidence was presented indicating that on the date of Beck's murder Frederick was too intoxicated to form a specific intent to kill. To the contrary, witness Jack Weese, who saw Beck and Jeff smoking marijuana and drinking wine that week, testified that Beck and Jeff were not "acting funny or acting drunk or anything like that." He was asked, "They were just acting regular?" He answered, "Like me and you are talking right, yeah." Bobby Hollingshead testified that neither Jeff nor Brad Beck were "falling down drunk" or "out of it." Delbert Goff testified that they were not loud or boisterous, just "kind of laughing."

¶ 130 Mere consumption of alcohol and marijuana is not sufficient to raise the voluntary intoxication defense without a showing that it prevented defendant from forming a premeditated intent. Appellant, after committing the murder, was able to drive over 300 miles in the victim's pickup to Dumas, Texas, and register at a motel using another alias, where he listed Beck's pickup on the registration slip. In his statement to Officer Bell, he was able to give a detailed description of how "Jeff" had dumped Beck's body, after he had killed him, in an open field in Spencer, Oklahoma, uncovered, and unburied. Jeff was the name he was using in Oklahoma the week of the murder. The accuracy of his description was confirmed when Beck's body was found. Frederick never claimed in his statement to Officer Bell that he had been intoxicated when he killed Beck, and in fact he was able to describe the events clearly.

¶ 131 As there was insufficient evidence of intoxication presented at trial from which a rational jury could find that the defendant was "so utterly intoxicated" that his mental powers were totally overcome, rendering it impossible for him to form the specific intent to kill, an instruction on voluntary intoxication was not warranted, and it would have been error to instruct the jury on that defense. *Crawford,* 1992 OK CR 62, ¶ 53, 840 P.2d at 638; *Jackson,* 1998 OK CR 39, ¶ 67, 964 P.2d at 892; *Taylor v. State,* 2000 OK CR 6, ¶ 20, 998 P.2d 1225, 1230, *cert. denied,*

531 U.S. 1157, 121 S.Ct. 1109, 148 L.Ed.2d 978 (2001).

¶ 132 Subproposition 9(A) is denied.

### Homicide Causation and *Corpus Delicti*

¶ 133 Appellant argues in Subproposition 9(B) that the trial court should have given Instruction No. 4–60, OUJI–CR (2d) on Homicide Causation, *sua sponte.* By failing to request the instruction, Appellant has waived review for all but plain error. *See e.g., Thornburg v. State.* 1999 OK CR 32, ¶ 13, 985 P.2d 1234, 1242, *cert. denied,* 529 U.S. 1113, 120 S.Ct. 1970, 146 L.Ed.2d 800 (2000). We find that the jury was adequately instructed on the causation requirement by the trial court's instructions Nos. 5, 6, and 9. Instructions Nos. 4–61, 4–62, and 9–14, OUJI–CR (2d).

¶ 134 Appellant further states the trial court should have given requested Instruction No. 9–27, OUJI–CR (2d) on *corpus delicti.* We note that the court did give defendant's requested Instruction No. 9–14, OUJI–CR (2d). The court properly gave No. 9–14 because in a homicide case, both the death of the victim and the fact that the defendant killed the victim must be proven independently beyond a reasonable doubt. 21 O.S.1991, § 693. Appellant claims the refused instruction, No. 9–27, was relevant both to the corroboration requirements for *corpus delicti* and the alleged confession. However, no corroboration (of a confession) instruction on *corpus delicti* is needed because we abolished the former "*corpus delicti* rule" (which pertained to the admission of confessions) with the case of *Fontenot v. State,* 1994 OK CR 42, ¶ 20, 881 P.2d 69. See our discussion of *Fontenot* above in Proposition Six. Instruction No. 9–27, the general corroboration instruction, was not needed because a specific corroboration instruction for confessions, Instruction No. 9–13, was given by the court.

### Heat of Passion Manslaughter

¶ 135 Appellant also argues in Subproposition 9(C) that the trial court should have instructed on the lesser included offense of First Degree Heat of Passion Manslaughter. However no evidence was presented

that indicated Frederick killed Beck in a heat of passion or that there was any provocation. The evidence showed, to the contrary, that Beck was partially paralyzed and virtually defenseless against an attack from an able-bodied man. Appellant cites cases in which First Degree Heat of Passion Manslaughter instructions were properly given but cites no evidence that would justify such instructions in this case. There was no evidence of mutual combat. No witness has stated that Frederick received as much as a scratch when killing Beck. We said in *Charm v. State*, 1996 OK CR 40, ¶¶ 8–9, 924 P.2d 754, 760, *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997):

> "The crime of first degree manslaughter on which Charm claims the trial court should have administered an instruction is found at 21 O.S.1991, § 711(2). A homicide is first degree manslaughter '[w]hen perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon....' To warrant a manslaughter instruction, the evidence must 'reasonably suggest that [the accused] committed the murder in the heat of passion and without an intent to kill.' The 'passion' necessary to support a manslaughter instruction must be so great as to 'render the mind incapable of forming a design to effect death....' The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportuni-

ty for the passion to cool; and 4) a causal connection between the provocation, passion and homicide.... Charm does not present and the record does not reflect evidence of victim provocation and the requisite resulting emotional response of the perpetrator which must exist before a manslaughter instruction may be properly administered."

¶ 136 In *Shrum v. State*, 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036, we stated that the test for including instructions on lesser degrees of homicide, in a murder case, is whether the lesser degree of homicide is "supported by the evidence." We did not elaborate on the definition of "supported by the evidence," except in a footnote, quoting from the case of *Malone v. State*, 1994 OK CR 43, ¶ 8, 876 P.2d 707, 719:

> "It is beyond dispute that **the trial court must instruct the jury on every degree of homicide where the evidence would permit the jury rationally to find the accused guilty of the lesser offense and acquit him of the greater.**" *Shrum*, 1999 OK CR 41, ¶ 6 n. 2, 991 P.2d 1032, 1034 n. 2. (Emphasis added.)

■ ¶ 137 The opinion in *Malone* by Judge Strubhar expressed the view of a unanimous court. We also cited the *Malone* test in the plurality opinion of *Gilson v. State*, 2000 OK CR 14, ¶¶ 113–116, 8 P.3d 883, *cert. denied*, —— U.S. ——, 121 S.Ct. 1496, 149 L.Ed.2d 381 (2001). The principle articulated in *Malone* had been followed in practice by this Court in many cases over the years.[11] The test is an objective one-we do not ask a jury to consider a lesser offense if

11. See, for example, *Darks v. State*, 1998 OK CR 15, ¶ 31, 954 P.2d 152, 161 ("Appellant shot the decedent four times at close range in vital areas of her body: twice to the head and twice to the trunk of her body. As such, the trial court properly did not instruct [on] First Degree Manslaughter."); *Charm v. State*, 1996 OK CR 40, ¶¶ 10, 7, 924 P.2d 754, 760–61 ("Nothing in these facts suggests anything but a design to effect the death of one specific person. These facts do not support a second degree murder instruction." "[L]esser included offense instructions need not automatically be given in death cases, but are required only when supported by the evidence. The evidence in this case did not support an instruction on either first degree manslaughter or second degree murder, and the trial judge thus properly refused to administer

them."); *Edinburgh v. State*, 1995 OK CR 16, ¶ 9, 896 P.2d 1176, 1178 ("Appellant placed the gun against the victim's head and pulled the trigger. There could be no other intent than to effect death. As such, the trial court properly refused Appellant's requested instructions for Second Degree (Depraved Mind) Murder, First Degree (Heat of Passion) Manslaughter, Second Degree (Culpable Negligence) Murder."); *Boyd v. State*, 1992 OK CR 40, ¶ 11, 839 P.2d 1363, 1367–68, *cert. denied*, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993) (With regard to a requested instruction on Second Degree Murder we said, "The evidence presented at trial does not support the conclusion that appellant acted without any premeditated design to effect death. **We have held that where there is no evidence to support a lower degree of the crime charged or lesser**

no jury could **rationally** find both that the lesser offense was committed and that the greater offense was not. The Oklahoma and federal courts use similar language on this point. The United States Supreme Court stated in *Beck v. Alabama*, 447 U.S. 625, 635, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392, 401 (1980):

"In the federal courts, it has long been 'beyond dispute that **the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty**

included offense, it is not only unnecessary to instruct thereon, the court has no right to ask the jury to consider the issue.") (emphasis added) (With regard to a requested instruction on Manslaughter in *Boyd,* ¶ 10, 839 P.2d 1363, we said, "[A]fter appellant shot the Officer the first time, he removed the gun from his coat pocket, placed the barrel against the Officer's chest and fired the weapon a second time.... [W]e do not believe that a rational juror could find that the death was not the result of a premeditated design to effect death. Accordingly, we find no abuse of discretion in the trial court's failure to instruct the jury on First Degree Manslaughter.") (emphasis added); *Boltz v. State,* 1991 OK CR 1, ¶ 20, 806 P.2d 1117, 1124, *cert. denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991) ("The trial judge was correct as to his ... refusal to instruct on heat of passion. The evidence clearly showed, appellant had a design to effect death."); *Williams v. State,* 1991 OK CR 28, ¶ 14, 807 P.2d 271, 274–75 ("**We now conclude that no rational trier of fact could have found that the death was the result of anything but a premeditated design to effect death.** Accordingly, we hold that the trial court did not abuse its discretion in refusing to instruct on second degree murder.") (emphasis added); *Duvall v. State,* 1991 OK CR 64, ¶ 10, 825 P.2d 621, 627, *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992) ("**Considering the nature of the wounds and the surrounding circumstances, a rational juror could not find from the evidence that Karla Duvall's death was not the result of a premeditated design to effect death.** Clearly there was no evidence that the death arose from heat of passion. Therefore, Appellant was not entitled to an instruction on first degree manslaughter or second degree murder.") (emphasis added); *Brown v. State,* 1989 OK CR 33, ¶ 10, 777 P.2d 1355, 1358 ("[T]he evidence clearly showed appellant had a design to effect death and, therefore, he was not even entitled to an instruction on first degree manslaughter."); *Hale v. State,* 1988 OK CR 24, ¶ 19, 750 P.2d 130, 136, *cert. denied,* 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164 (1988) (The trial court properly refused to give instructions on Manslaughter and Second Degree Murder. "**The murder victim in this case died from gunshot wounds to the head**

**of the lesser offense and acquit him of the greater.'** *Keeble v. United States, supra,* [412 U.S. 205] at 208, 36 L.Ed.2d 844 [at 847], 93 S.Ct. 1993 [at 1995 (1973)]." (Emphasis added.)

¶ 138 The rule followed in *Boyd, Malone, Shrum,* and *Gilson,* is consistent with the instruction we have given juries for over ninety years on how they must proceed when they are instructed on a lesser included offense. This Court has said at least as early as 1913, in *Nichols v. State,* 10 Okl.Cr. 247, 135 P. 1071, 1072:

**fired from close range after being shot in the arm, leg, and abdomen. From the nature of the wounds and the surrounding circumstances, we do not believe that a rational juror could find from the evidence that the death was not the result of a premeditated design to effect death,** and there was absolutely no evidence that the death arose from heat of passion.") (emphasis added); *Taylor v. State,* 1988 OK CR 183, ¶¶ 7–8, 761 P.2d 887, 889; (Defendant was charged with assault and battery with intent to kill; the trial court only instructed on the lesser included offense of assault and battery with a dangerous weapon. "[E]vidence [was] uncontroverted that appellant assaulted Parks with a dangerous weapon, a Buck folding knife.... [W]e cannot find the trial court abused its discretion in refusing to give an instruction on assault and battery."); *Hendricks v. State,* 1985 OK CR 39, ¶ 9, 698 P.2d 477, 480, *overruled on other grounds by Parker v. State,* 1996 OK CR 19, ¶ 23 n. 4, 917 P.2d 980, 986 n. 4, *and Cleary v. State,* 1997 OK CR 35, ¶ 27, 942 P.2d 736 (Where defendant was charged with Assault and Battery With Intent to Kill, no instruction on the lesser included offense of simple Assault and Battery was needed, "in light of the uncontradicted evidence that the assault involved a dangerous weapon,"); *Lloyd v. State,* 1982 OK CR 184, ¶ 3, 654 P.2d 645, 646 (We held, "While Assault and Battery may be a lesser included offense of Assault and Battery With a Dangerous Weapon, uncontroverted evidence showed that the attack was made with a broken bottle.... [I]t is not necessary for the trial court to instruct on a lesser included offense where there is no evidence to support such an instruction."); *Irvin v. State,* 1980 OK CR 70, ¶ 33, 617 P.2d 588, 596 ("As was stated in the early case of *Jones v. State,* 12 Okl.Cr. 255, 154 P. 689, 690–91 (1916), **where there is no evidence to support a lower degree of the crime charged or included offense, it is not only unnecessary to instruct thereon, but the court has no right to ask the jury to consider the issue.**") (emphasis added); *Gist v. State,* 1973 OK CR 192, ¶ 11, 509 P.2d 149, 152 (We held in an appeal from a conviction for Shooting with Intent to Kill, that the trial court properly refused the requested instructions on simple "Assault and Battery.").

"The jury should have been told if, after a fair and impartial consideration of all of the evidence in the case, they were not convinced beyond a reasonable doubt of the defendant's guilt, as charged ... then it would be their duty to consider as to whether he was guilty of the next lower offense embraced in the charge."

¶ 139 This is still the law in Oklahoma. We do not just throw all requested lesser-included instructions at a jury and tell them to "pick one." Our law has always provided structure for jury consideration of lesser included offenses. That structure has been provided for almost twenty years by the language of Oklahoma Uniform Criminal Jury Instructions. Instruction No. 10–24, Lesser Included Offenses, OUJI–CR (2d) (1996), substantially unchanged from No. 912, OUJI–CR (1981), says:

"The defendant is charged with [Crime Charged In the Information/Indictment]. You are instructed that in addition to evidence concerning the crime of [Crime Charged In the Information/Indictment], evidence has also been introduced concerning the crime of [Lesser Included Crime]. If you have a reasonable doubt of the defendant's guilt of the charge of [Crime Charged In the Information/Indictment], you must then consider the charge of [Lesser Included Crime]."

¶ 140 There was no evidence from which a rational jury could have found Frederick not guilty of Murder in the First Degree, and guilty of First Degree (Heat of Passion) Manslaughter. The Court therefore acted properly in not giving, *sua sponte*, a heat of passion manslaughter instruction.

### Trial Court Did Not Give Instructions *Sua Sponte* on Insanity

¶ 141 Appellant complains in Subproposition 9(D) that the trial judge gave no instructions *sua sponte* in the first stage on diminished capacity, insanity, or other mental disorder. The court properly did not give such instructions, as they were not supported by the evidence. The court would have been correct in refusing such instructions if they had been requested.

¶ 142 As we said above in discussing Frederick's Subproposition 5(F), the expert did not claim that the mental condition of amnesia, or dissociative fugue, amounted to insanity under the statutory definition in Oklahoma, and therefore his opinion was not relevant to the first stage guilt or innocence issues. *See Sellers v. State*, 1991 OK CR 41, ¶ 34, 809 P.2d 676, 686–87 ("Mere inability to remember an event, in and of itself, cannot establish automatism, since **the relevant inquiry involves the accused's knowledge and control at the time of the conduct, not at the time of trial.**") (emphasis added).

¶ 143 Perhaps amnesia belongs in a category with "ignorance of the law," about which it has been said, if it were available as a criminal defense, every man would claim it. Oklahoma law does not provide for a diminished capacity defense except for the limited voluntary intoxication defense, and the defense of insanity at the time of the crime, neither of which was supported by the facts of this case. Dr. Coons, *in camera*, said he could not say that Frederick was incapable of knowing right from wrong or appreciating the nature of his acts. He testified: "I would say if a person attempts to hide what they've done, that that could be an indication they knew right from wrong." The prosecutor asked: "And the bottom line, Dr. Coons, is you cannot tell this jury today that Earl Alexander Frederick does not know the difference between right and wrong or didn't know the difference back in November of 1989?" He answered, "I can't tell one way or the other whether he knew right from wrong."

¶ 144 The prosecutor then asked: "You are not here to tell this jury that Earl Alexander Frederick was insane in November of 1989; is that correct?" and he answered, "I cannot."

¶ 145 As there was no evidence supporting a *sua sponte* instruction on insanity, we find no merit in this subproposition.

### Residual Doubt

¶ 146 Frederick claims in Subproposition 9(E) that the trial court refused to grant his

written requested instruction on "residual doubt" as a mitigating circumstance. He admits we have rejected this argument in *Bernay v. State*, 1999 OK CR 37, ¶¶ 49–50, 989 P.2d 998, 1012. We reject it here also.

## PROSECUTORIAL MISCONDUCT

### First Stage

¶ 147 Frederick complains in Subproposition 8(C) about two statements the prosecutor made in first stage closing argument: (1) that Frederick was in a bar in Amarillo on November 19, 1989, "playing foosball, having a good time," only eight or nine days after he killed Brad Beck, and (2) that he was in a bar in Texline on November 14, three days after he killed Brad Beck, "drinking and having a good time." Frederick's appellate counsel complains this was "unfair" because of Frederick's lack of memory, implying Frederick could not remember the murders on November 14 and 19. Appellant's own signed statement of November 20 indicated he was in the bar in Texline, November 14, and clearly remembered Fox's murder. His further statement of November 21 indicated he clearly remembered committing both murders. The prosecutor's comment about the bar in Amarillo where Appellant was playing foosball accurately describes the circumstances of his arrest. There were no contemporaneous objections, and no plain error. *Hammon v. State*, 2000 OK CR 7, ¶ 63, 999 P.2d 1082, 1097, *cert. denied*, 531 U.S. 1090, 121 S.Ct. 812, 148 L.Ed.2d 697 (2001); *Lawson v. State*, 1987 OK CR 140, ¶ 13, 739 P.2d 1006, 1008. This part of Subproposition 8(C) is denied.

¶ 148 Appellant alleges in his Subproposition 13(B) that in the first stage of trial several instances of prosecutorial misconduct occurred and deprived him of a fair trial. There were five instances of alleged prosecutorial misconduct that received no contemporaneous objections, and we examine them for plain error only. *Hammon, supra; Lawson, supra.*

¶ 149 First, it was not improper for the prosecutor to comment that a wrench found near the victim's body could have been the murder weapon, which was not an unreasonable inference from the evidence.

¶ 150 Both parties are entitled to argue the evidence from their perspective. We said in a syllabus by the Court in *Brown v. State*, 52 Okl.Cr. 307, 4 P.2d 129, 130 (1931):

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide. Counsel for both the state and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it."

*See also, Kennamer v. State*, 59 Okl.Cr. 146, 187–188, 57 P.2d 646, 664 (1936) (quoting *Brown, supra*).

¶ 151 Next, Frederick complains that the prosecutor's comments that Dr. White, a defense pathologist, "agreed the death of Bradford Beck was a homicide, not caused by a fall or an accident," did not accurately reflect the witness's testimony. We find that Dr. White testified that he agreed with the report of Dr. Jordan, would not have written the autopsy report any differently, and had no problem with Dr. Jordan's testimony that "to a reasonable medical certainty ... the skull fractures and the resultant injury to the brain caused his death." The prosecutor's comments were reasonably based on the testimony.

¶ 152 Next, Appellant complains that the "prosecutor elicited sympathy for the deceased three times." We find however, that the prosecutor's comments were not designed to elicit sympathy for the deceased, but merely described the physical limitations of the victim that had been proven by the evidence. These comments were relevant to show why the deceased was selected as a victim by Appellant and to show that it was unlikely that the deceased had walked to the field where his body was found, or set out to hitchhike to old Mexico as Appellant first claimed.

¶ 153 Next, Appellant complains that the prosecutor claimed, without objection, that "anyone facing criminal charges and claiming some mental illness had a motive to absolve themselves of criminal liabili-

ty." It was not error to comment on motive. Appellant's own witness, Dr. Coons, admitted that persons facing criminal charges were more likely to fake amnesia than other persons. See footnote 12, above. *Kennamer,* 57 P.2d at 664. Under the next complaint, we find it was not plain error to use the word "ploy." Appellant's brief admits that none of these five prosecutorial comments were objected to at trial, and we find no plain error, or error which deprived the defendant of a fair trial. *Lawson,* 1987 OK CR 140, ¶ 13, 739 P.2d at 1008.

¶ 154 With regard to the first of the three complaints of prosecutorial comments in the first stage closing argument that were objected to at trial, we find that it was not improper bolstering of an expert witness to ask the witness, over objections, whether he "worked for a straight salary or was paid by the case." With regard to the next alleged instance of improper comment which was objected to at trial, we find that the comments, "this is a pretty open and shut case and pretty clear cut" were permissible comments on the evidence from the prosecutor's perspective. Actually, the transcript reflects that these comments were preceded by the following words, which were omitted from Appellant's brief: "I would submit to you that. . . ." These words invite jurors to draw inferences from the evidence and were not expressed in terms of personal opinion. *Lawson,* 1987 OK CR 140, ¶ 13, 739 P.2d at 1008; *Kennamer,* 57 P.2d at 664. There was no error here.

¶ 155 As to the third complaint of improper first stage prosecutorial comments for which there was a contemporaneous objection, we find that the prosecutor's question of Dr. Coons, whether Appellant was "working off charges" when he was working undercover for the police, implied that Appellant had committed a crime for which he had not been charged. This was improper cross-examination if the prosecutor had no specific information that such was the case. Counsel failed to preserve this question for review, however, because he did not make a record at the bench as to whether the prosecutor had a basis for the question. Even if we were to assume for purposes of this argu-

ment that there was no specific basis for asking such a question, however, we would find that the question was harmless error, as there was no possibility the question in this case could have determined the outcome of the trial or deprived the defendant of a fair trail. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

¶ 156 Therefore, we deny Appellant's Proposition 13(B).

## Second Stage Prosecutorial Misconduct

¶ 157 Under the heading, "First Stage," in Appellant's brief, Subproposition 13(B), he complains about closing argument of the prosecutor that actually occurred in the second stage. The comments of the prosecutor in the second stage closing argument regarding Appellant's previous incarceration in the penitentiary were certainly not "disclosures of a party's criminal record" as Appellant claims. These comments were fair comment upon Appellant's evidence. *Kennamer,* 57 P.2d at 664. Appellant brought a minister and a records custodian from the penitentiary to demonstrate that Frederick had been a "model prisoner since 1989." It was Appellant's strategy to show that he could not be a continuing threat to society because he would continue to be locked up securely in the penitentiary. It was not improper for the prosecutor to comment on Appellant's evidence.

¶ 158 Frederick complains in Subproposition 8(C) that the prosecutor was allowed to discuss "lack of remorse" in her second stage closing argument. Although Appellant had filed a motion in limine on "lack of remorse" before trial, and it had been overruled, there were no contemporaneous objections when the comments were made at trial, and the pre-trial ruling was not sufficient to preserve this issue for appeal. We therefore examine only for plain error. *Simpson,* 1994 OK CR 40, ¶ 2, 876 P.2d at 693.

¶ 159 The term "lack of remorse" used by the prosecutor in closing argument was a proper comment on a quote from Frederick's own psychiatrist, Dr. Coons, in discussing characteristics of a borderline antisocial per-

sonality. However, there would be nothing "unfair" or improper about arguing Frederick's lack of remorse. The evidence was in dispute regarding Frederick's amnesia. He obviously was not in a fugue, or state of amnesia, during the days following the murder when he confessed to Officer Tim Bell on November 21, 1989. Dr. Coons, stated he could not entirely rule out malingering. He said "amnesia" is now called "dissociative fugue." He also admitted on cross-examination that the majority of the committee which wrote the section on dissociative fugue for the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (4th Ed.1994) (DSM–IV), believed that there was no reliable test to determine if someone was faking amnesia.[12]

¶ 160 The trial court instructed the jury they could consider as Frederick's fifteenth mitigating circumstance: "The defendant has demonstrated remorse for the homicides." We find that either party could argue, from their standpoint, evidence of Appellant's remorse or lack of remorse. *Woodruff v. State,* 1993 OK CR 7, ¶ 70, 846 P.2d 1124, *cert. denied,* 510 U.S. 934, 114 S.Ct. 349, 126

L.Ed.2d 313 (1993); *Kennamer,* 57 P.2d at 664.

¶ 161 Appellant alleges in his Subproposition 13(C) that in the second stage of trial seven other instances of prosecutorial misconduct occurred and deprived him of a fair trial. We examine these seven alleged instances of prosecutorial misconduct in the second stage of the trial for plain error only, since there were no contemporaneous objections. *Lawson,* 1987 OK CR 140, ¶ 13, 739 P.2d at 1008. We find that the prosecution's speculation, without objection, that Appellant "dreamed up" his claim to Dr. Coons that he had been sexually molested as a child by his mother did not rise to the level of plain error. There was no direct evidence of the molestation. Frederick's brother, who testified for the defense, had no knowledge of the supposed molestation.

¶ 162 We find no plain error in the prosecutor's statement, without objection, that there was nothing illegal, unethical, or improper about them hearing during the penalty stage about the circumstances of Shirley Fox's murder, and that if it had not been legal, the judge would not have allowed them to hear it. We find no plain error in

---

12. The prosecutor asked, and Dr. Coons answered, as follows:

"Q. You also talked about malingering and in the diagnostic criteria that you all develop and put together, so that other psychiatrists and psychologists could look at this in trying to help them diagnose people because that's kind of what this is for, right?
A. Correct.
Q. For doctors like you to look at and say, when I'm deciding whether or not somebody has this illness, I can look at the diagnostic criteria and it should help me figure out if they've actually got it or not?
A. Correct.
Q. And one of the things that it says here are there are no tests or set of procedures that distinguish a true dissociative symptom from those that are malingered or faked, right?
A. It says that, but I'm not sure that—
Q. You agree that it says that, right?
A. I agree it says that.
Q. There are no tests that can tell if it's faked or if it's real?
A. There is no single test—I think taken out of context—that can tell, but when you look at the whole ball of wax altogether, I think tests are helpful.

Q. How come you didn't put that in here then? Why didn't you describe to other psychologists that they could use those tests to make that determination?
A. Well, there was disagreement on the committee that wrote this.
Q. So some people didn't think you can tell the difference, and you thought you could, and you didn't win?
A. Well, it wasn't just me. It was other people. It was a simple majority that ruled.
Q. So the majority of the people likely situated as you are, psychiatrists, psychologists, whatever, didn't agree with that and didn't put it in here?
A. Correct.
Q. Okay. It also says that malingering of a fugue state occurs in individuals who are attempting to flee a situation involving legal, financial, or personal difficulties.
A. Right.
Q. So in other words, people who have a reason to pretend to be amnesiac do it a lot? In other words, because they think it will get them out of what they've done, keep them out of trouble?
A. That can happen."

the prosecutor's argument, without objection, that death was the only appropriate punishment. Both sides are entitled to argue their recommendation as to penalty, and the argument was not expressed as a personal opinion. Likewise, the prosecutor is entitled to argue that the mitigation factors did not "in any way [reduce Appellant's] moral culpability or blame." This comment was prefaced with, "I would submit to you, . . ." and was not an expression of personal opinion. There was no objection and no plain error. *Lawson*, 1987 OK CR 140, ¶ 13, 739 P.2d at 1008

¶ 163 The prosecutor's comments, which were not objected to, about the victim's disabilities did not amount to improper requests for sympathy for the victims and their families, and were not plain error. It was not improper and therefore not plain error for the prosecutor to display to the jury, without objection, during closing argument, photographs which had been properly admitted into evidence. It was not plain error for the prosecutor to refer, without objection, to Dr. Coons's testimony as "psychiatric stuff" or "junk." As we said with regard to the first stage closing arguments, it was not improper or plain error to speculate that the wrench that was found near the victim's body could have been the murder weapon. *Kennamer*, 57 P.2d at 664.

¶ 164 We find no plain error, or error which deprived the defendant of a fair trial, under his Subproposition 13(C). We deny Appellant's entire Proposition Thirteen.

### TRANSCRIPTS

¶ 165 Appellant claims in his tenth proposition that he has been denied an adequate opportunity to present his appeal and deprived of effective assistance of appellate counsel due to the failure of the court to provide a full and accurate transcript of the trial proceedings for purposes of appeal. Appellant claimed there were numerous inaccuracies in the trial transcript including 16 places where the proceedings were reported as "inaudible."

¶ 166 Appellant applied to this Court in 1999 for assistance in getting an accurate transcript, and we remanded this matter to the trial court for an evidentiary hearing. Before the hearing, the reporter corrected several pages where her computer had deleted or duplicated lines. An evidentiary hearing was conducted by the Honorable Virgil Black on August 4, 1999, pursuant to our order, to determine whether the "inaudible" portions of the transcript could be settled by the court and the parties, and whether any portion of the transcript that could not be recovered would be material to any issue to be raised on appeal that would deny this Court the ability to adjudicate the appeal.

¶ 167 Six persons who had been present at trial cooperated in reconstructing the inaudible phrases to the best of their ability from their individual notes and their memory of the original questions or testimony. Present at the hearing were the trial judge, the original court reporter, the two attorneys who had represented Appellant at trial, the two prosecuting attorneys who represented the State at trial, and appellate attorney, Mr. Sutton. A second court reporter was present to transcribe this hearing.

¶ 168 The reporter testified that it was her practice to interrupt a speaker if she could not understand more than a "word or two" of their testimony. During transcription, she had the benefit of an audio tape which she had made of the proceedings contemporaneously with her computer steno tape. She, with the help of an assistant, who she calls a "scopist," carefully listened to the audio tape to attempt to decipher any portions of the proceedings she had marked inaudible. However, approximately 15 "inaudibles" remained.

¶ 169 Pursuant to local court rules in effect at that time, the audio tapes were reused for other cases after the transcript was completed, and the audio tapes of the testimony in Frederick's trial no longer exist, although the computer steno tapes are still preserved. We strongly recommend that no audio tape of any criminal trial be destroyed in the future in any case which is pending on appeal, and especially in any death penalty case in which the defendant is awaiting direct or collateral appeal, retrial, re-sentencing, or execution. Of course, any reporter who does not understand a word at trial should imme-

diately ask the speaker to repeat or spell the word, or seek assistance of the court. The court can correct the problem immediately if properly advised. If a reporter cannot decipher a word when preparing the transcript of trial, he or she should notify the trial judge before certifying the transcript. The judge should notify both parties, and if agreement cannot be reached informally, a hearing to settle the transcript should be scheduled. Counsel for the parties may be able to decipher the inaudible word or phrase by listening to the audio tape and examining their own notes and files while their memories of the testimony are still fresh. The court reporter should be prepared to testify and to replay the portion of the audio tape in question, and a second court reporter should take down the proceedings.

¶ 170 We commend the trial court, the reporter, and the trial counsel for both parties for the cooperative effort with which they attempted to decipher the inaudible portions of testimony and to settle the transcript in this case.

¶ 171 Pursuant to this Court's directive, Judge Black filed "Findings of Fact and Conclusions of Law" on August 11, 1999. He found that the parties were able to agree generally as to the substance, although not always the specific words, of what was said in all but three of the inaudible phrases in the ten-volume, 2100 page transcript covering the ten-day trial. He further found as a matter of law that none of the inaudible portions of the record were material to any issue to be raised on appeal.

■ ¶ 172 Appellant has not called our attention in his appeal brief to any particular omissions from the trial transcript, and he has not attempted to make a showing that any of those particular omissions deprived him of an adequate record on appeal or denied him effective assistance of appellate counsel. It is not enough to claim there were inaudible phrases in the transcript, not call them to our attention in his appeal brief, and only claim in general that he was deprived of a transcript and his right to appeal. Counsel on appeal must cite to specific points in the record where he claims errors prejudiced the right to a fair trial, must specifical-

ly argue how Appellant was prejudiced, and must provide relevant and specific citations of authority in support of his assertions. *Van Woundenberg v. State*, 1986 OK CR 81, ¶ 18, 720 P.2d 328, 335, *cert. denied*, 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). Appellant in his tenth proposition has failed to do this, has therefore failed to present any possible error for review by this Court, and has effectively chosen to abandon this proposition. Proposition Ten is denied.

## LEGAL ISSUES DECIDED PREVIOUSLY

¶ 173 In Proposition Twelve, Appellant lists the twenty (20) following issues that he concedes have been previously decided by this Court adversely to his position, but nonetheless asks us to reconsider those cases:

"A. Diminished Effect on Mitigating Evidence.

B. Weighing Aggravating Circumstances.

C. Definition of Life Without Parole.

D. Unconstitutionality of Death Penalty.

E. Special Findings of Fact [by jury].

F. Cost Effectiveness and Lack of Deterrent Value of Death Penalty.

G. Presumption Any Sentence Imposed Will be Carried Out.

H. [Requested Instruction on] Presumption of Life Imprisonment.

I. Right to Allocution and to Argue Last.

J. Exclusion of Jurors over 70 and Economically Disadvantaged Jurors.

K. Unconstitutionality of Victim Impact Testimony.

L. Motion to Allow Separate Jury to Decide Punishment.

M. Duplicative Aggravation Evidence.

N. 'Death Qualified' and 'Conviction Prone' Jury.

O. [Requested] Instruction [Defining] 'Reasonable Doubt'.

P. Unconstitutional Vagueness of Avoiding Lawful Arrest and Continuing Threat Aggravators.

Q. [Evidence of] Unadjudicated Acts [Used to Prove Aggravators].

R. Refusal to Allow Voir Dire [on Certain Mental-health and Mitigation Issues].

S. Presence of Accused at All Stages of Proceedings. [Presence was Waived at Certain Pre Trial and *In Camera* hearings.]

T. [Requested] Moratorium [on Death Penalty]."

¶ 174 See our previous opinions deciding the issues listed in his twelfth proposition.[13] Without deciding whether, despite his cursory mention of these "issues" on appeal, Appellant has properly preserved and presented these issues for our consideration or preserved them for further appellate review, we find that Appellant has failed to cite any controlling authority or demonstrate any other reason for this Court to reconsider or alter its position on any of the foregoing issues. See *Bernay v. State*, 1999 OK CR 37, ¶ 55, 989 P.2d 998, 1013. We note that Appellant admits in his brief under Subproposition 15(A) (see below) that three of these issues were not preserved for review because his trial counsel failed to make timely, specific objections, request admonishments, request a mistrial, or take other appropriate actions to properly preserve for appellate review the issues raised in Propositions 12(M) (Duplicative Aggravation Evidence), 12(S) (Presence of Accused at All Stages of Proceedings), and 12(T) (Moratorium on

Death Penalty). Proposition Twelve is denied.

## JUDICIAL BIAS

 ¶ 175 Frederick on appeal claims in his Proposition 13(A) that being tried before a judge who was biased against him deprived him of a fair trial and fair sentencing hearing. "[T]he Oklahoma Constitution guarantees every person charged with a crime a trial in which the trial judge does not entertain a personal prejudice against him or her. Okl. Const. Article II, § 6." *Arnold v. State*, 1990 OK CR 78, ¶ 15, 803 P.2d 1145, 1148. This does not mean that the trial judge may not have an opinion as to the defendant's guilt or innocence, or may not be prejudiced against the crime charged. *See T.R.M. v. State*, 1979 OK CR 59, ¶ 10, 596 P.2d 902, 905. "[T]here is a general presumption of impartiality on the part of judges as to matters before them." *Pittman v. State*, 1986 OK CR 59, ¶ 7, 718 P.2d 366, 369.

 ¶ 176 Frederick states that at a pre-trial hearing sometime before May 1, 1997, Judge Black, who was newly appointed to his case, commented that Frederick's first trial, which resulted in a death sentence, should have been affirmed, and the reversal by the Court of Criminal Appeals was unnec-

**13.** **A.** *Al–Mosawi v. State*, 1998 OK CR 18, 956 P.2d 906. **B.** *Hamilton v. State*, 1997 OK CR 14, 937 P.2d 1001; *Fields v. State*, 1996 OK CR 35, 923 P.2d 624; *Allen v. State*, 1994 OK CR 13, 871 P.2d 79. **C.** *McCracken v. State*, 1994 OK CR 68, 887 P.2d 323; *Jones v. State*, 1995 OK CR 34, 899 P.2d 635; *Douglas v. State*, 1997 OK CR 79, 951 P.2d 651; *Mollett v. State*, 1997 OK CR 28, 939 P.2d 1; *Taylor v. State*, 2000 OK CR 6, 998 P.2d 1225. **D.** *Romano v. State*, 1993 OK CR 8, 847 P.2d 368; *Allen v. State*, 1994 OK CR 13, 871 P.2d 79; *Walker v. State*, 1994 OK CR 66, 887 P.2d 301; *LaFevers v. State*, 1995 OK CR 26, 897 P.2d 292; *Fields v. State*, 1996 OK CR 35, 923 P.2d 624. **E.** *Duckett v. State*, 1995 OK CR 61, 919 P.2d 7. **F.** *Bradley v. State*, 31 Okl.Cr. 194, 237 P. 625 (1925); *Smallwood v. State*, 1995 OK CR 60, 907 P.2d 217. **G.** *Welch v. State*, 1998 OK CR 54, 968 P.2d 1231. **H.** *Duckett, v. State*, 1995 OK CR 61, 919 P.2d 7. **I.** *Duckett, id.* **J.** *Wright v. State*, 1972 OK CR 196, 500 P.2d 582; *Howell v. State*, 1994 OK CR 62, 882 P.2d 1086; *Nolte v. State*, 1994 OK CR 81, 892 P.2d 638. **K.** *Cargle v. State*, 1995 OK CR 77, 909 P.2d 806, 824–830. **L.** *Banks v. State*, 1986 OK CR 166, 728 P.2d 497; *Trice v. State*, 1993 OK CR 19, 853 P.2d 203. **M.** *Woodruff v. State*, 1993 OK CR 7, 846 P.2d 1124; *Robedeaux v. State*, 1993 OK CR 57, 866 P.2d 417; *McCracken v. State*, 1994 OK CR 68, 887 P.2d 323; *Scott v. State*, 1997 OK CR 40, 942 P.2d 755. **N.** *Trice v. State*, 1993 OK CR 19, 853 P.2d 203. **O.** *Smallwood v. State*, 1995 OK CR 60, 907 P.2d 217. **P.** *Toles v. State*, 1997 OK CR 45, 947 P.2d 180; *Cheney v. State*, 1995 OK CR 72, 909 P.2d 74; *Fields v. State*, 1996 OK CR 35, 923 P.2d 624; *Charm v. State*, 1996 OK CR 40, 924 P.2d 754. **Q.** *LaFevers v. State*, 1995 OK CR 26, 897 P.2d 292; *Cannon v. State*, 1995 OK CR 45, 904 P.2d 89; *Cannon v. State*, 1998 OK CR 28, 961 P.2d 838; *Welch v. State*, 1998 OK CR 54, 968 P.2d 1231. **R.** *Jackson v. State*, 1998 OK CR 39, 964 P.2d 875, 883; *Patton v. State*, 1998 OK CR 66, 973 P.2d 270. **S.** *Clark v. State*, 1986 OK CR 65, 718 P.2d 375; *Van White v. State*, 1999 OK CR 10, 990 P.2d 253. **T.** *Douglas v. State*, 1998 OK CR 12, 953 P.2d 349; *Patton v. State*, 1998 OK CR 66, 973 P.2d 270.

essary. In Appellant's own words, in a letter he wrote May 1, 1997: "Because my first appearance in front of his honor he stated that he disagreed with the Criminal Court of Appeals [sic] and that my death penalty should have been affirmed." (Quoted in Appellant's Brief.) A judge is entitled to his opinions, so long as he does not let his expressions of opinion interfere with his duties or create an impression of partiality before parties or jurors. The judge did not remember making the remark, but the prosecutor recalled, "There was some statement made that you felt the reversal was unnecessary." Nevertheless, we find no evidence that the trial judge did anything other than follow our directives on retrial in an appropriate manner.

¶ 177 Neither Appellant nor his trial counsel at the time sought the judge's recusal, but now raise the judge's disqualification for the first time on appeal. Appellant complains of several comments made by the judge. Only one of these comments was made in the presence of the jury before the verdict was returned: The judge read from the **defendant's** witness list to advise jurors that "John Claig [sic], or a representative from the State penitentiary," was a potential witness. There was no objection, and therefore we will review for plain error only. Appellant's "Notice of Defense Witnesses" for "first and second stage of the proceedings" listed "Keeper of the records, or John Klink, H Unit, Oklahoma State Penitentiary, Box 97, McAlester, OK." The notice further said, "Will testify that defendant was cooperative, compliant, and posed no threat to anyone while incarcerated for this case." It was proper during voir dire to read each party's witness list to the jurors, together with their address and brief identification information such as job or title, in order to determine whether jurors were related to or acquainted with the witnesses. The court had announced to the jury before reading the list, "Now, they've taken this huge list [of potential witnesses] and cut it down to those [who] will most probably testify in this case. I'm going to read those names off and then ask you if you know any of these people." The jurors were not told what, or who, the witnesses would be testifying about, or which

party had listed the witness. There is no claim that Appellant requested the court to redact the witness's title before it was read to the jury.

¶ 178 By listing in the alternative a representative from the penitentiary by generic title, "Keeper of the records," Appellant was able to call a back-up witness in case Mr. Klink was not available. In fact, Tyrone Thain, another custodian of records from the penitentiary actually testified for Frederick at trial instead of Mr. Klink. Appellant had presented two witnesses from the penitentiary, including a chaplain and the keeper or custodian of the records. They testified that Appellant was a compliant prisoner. Appellant chose to admit as part of his case that he had been in the penitentiary and the prosecutor was entitled to comment on the evidence. Appellant cites no authority for this subproposition, and we find no plain error.

¶ 179 Frederick complains of three comments or rulings of the judge at the competency bench trial held July 10, 1997: that the trial judge stated his belief that Mr. Frederick was malingering, that the judge decided to start reading letters from Mr. Frederick, and that the judge denied requests for "memory treatment." We have discussed the court's competency rulings above under Subproposition 5(C). The judge had already announced his intention to find Appellant competent, but was trying to determine if he could legally order treatment for Appellant's claimed amnesia. His prediction that the State hospital would find that Appellant was malingering is not surprising considering the evidence he had just considered. Dr. Pennal concluded that he was malingering. Appellant's own psychologist, Dr. Coons, said he could not rule out malingering. Appellant had told Dr. Coons he could not remember anything from 1985 through 1989, a five-year period, including the murders of Mr. Beck and Mr. Fox. But Appellant had told Hogan, a cell-mate for two-and-a-half years, who he called as his own witness, that there was only a three-day period he could not remember very well. We find nothing improper about the judge reading letters sent to him by Appellant. The

judge had no authority to order memory treatment for a defendant he found to be competent, and therefore acted properly in refusing to send Appellant to a hospital for treatment. There is no indication of judicial bias here.

¶ 180 The "Capital Felony Report of the Trial Judge" is a form that the trial judge is required by our rules and by statute to fill out after a death sentence is imposed. See Rules 13.0, 13.12, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (1997) (Mandatory Forms to be Utilized in Criminal Cases in The State of Oklahoma); 21 O.S.1991, § 701.13(A). Our Rules say: "**The following forms shall be utilized by trial courts** and parties in the prosecution and appeal of criminal cases in the State of Oklahoma." Rules 13.0, 13.12, *supra* (emphasis added).

¶ 181 The trial judge used the version of that form that was required as of the date of Frederick's sentencing. The form at that time required the court to make comments under the heading, "**General comments of the Trial Judge concerning the appropriateness of the sentence imposed in this case.**" *Id.*, Rule 13.12(E)(12) (effective November 1, 1995) (emphasis added). Since this form is mandated for capital cases, it requires the judge to comment on the appropriateness specifically of the death penalty. The trial court had a duty to fill out the form honestly and candidly, and therefore the judge was entitled to state in the report that he "wholeheartedly agrees" with the "jurors who believe Mr. Frederick is an appropriate candidate for death." [14]

¶ 182 It also was not error for the trial judge to comment in his report that two juries had assessed the death penalty against Appellant since we were well aware of that fact, having reversed Appellant's first conviction and sentence of death. That fact has no bearing, however, on our decision on this appeal. It was not error, as such, for the judge to state in his report that Appellant "was a suspect in two more murders," since such a comment would have no effect on our decision. We presume Appellant's innocence of any other murder, and give no weight to this unsupported allegation. The comment in the report that Appellant "claimed" through his lawyer to have Multiple Personality Disorder was accurate because Appellant himself had not testified and his expert was unable to diagnose MPD. We cannot say the comments included in the Report of the Trial Judge were evidence of bias. The report further contained the mandatory final comment, which is unchanged in the current version: "This report was submitted to the defendant's counsel for such comments as he desired to make concerning the factual accuracy of the report." The following option was checked: "He stated he had no comments." Therefore, trial counsel did not contest the factual accuracy of any statement made in the report.

¶ 183 The trial court was not biased in restricting the psychiatrist's testimony about amnesia during the first stage because the testimony of Dr. Coons was not sufficient to support finding the defendant insane under Oklahoma law. His testimony about MPD was not restricted. The trial court was not biased in refusing to give a First Degree Heat of Passion Manslaughter instruction. We have determined under Proposition Nine above that his refusal to give this instruction was proper. After the jury had returned its verdict of death, the judge did not tell the jurors, as Appellant claims, that giving the death penalty was the "right thing," but actually said:

> "I appreciate your service in this case. I know it is a very difficult thing to do, what you have done. Something for you to take

---

14. We note that the comparable questions in the current "Capital Felony Report of the Trial Judge" (effective September 1, 1998), which was not in effect when Appellant was sentenced, are less open-ended, calling for shorter answers, and are more tailored to the evidence presented in court: "**1. Is there anything in the pretrial proceedings, the trial, or the sentencing which would cause you to question the appropriateness** of the death sentence being imposed on this case?" and "**2. If you question the appropriateness of the death sentence in this case, what would be your recommendation as to sentence?**" Rule 13.0, Form 13.12, (D)(1), (2), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001) (amended effective September 1, 1998) (emphasis added).

with you that I thought Ms. Elliott was going to say in closing argument: It is not always easy to do the right thing, but it is always the right thing. Okay? Something for you to think about."

This statement does not reflect bias against Appellant and, in any event, could not have affected the verdict, as the verdict had already been received.

¶ 184 We observe that neither Frederick, who felt comfortable bypassing his counsel and writing letters directly to the judge, nor counsel ever asked the judge to recuse himself. They preferred that the judge rather than a jury hear his competency hearing. Frederick asked the judge whether he could plead no contest to the judge if his competency was determined, and if he were found fit and competent. The defendant and counsel, who had personal interaction with the judge, were in a better position than appellate counsel to determine bias.

¶ 185 We note that at the hearing on withdrawal of demand for jury for the post-evaluation competency hearing, counsel advised the judge that Frederick had a bad toothache. Counsel asked the judge to intercede with the Sheriff's Office to get Frederick back to the jail quickly to get his tooth worked on before the medical personnel left. The judge immediately interceded and asked, "Can you arrange that, Sheriff?" The Deputy answered, "Yes, I sure can." The judge then said to the Deputy, "Get him back over there," and asked Appellant, "Fair enough?" Frederick responded, "Fair enough."

¶ 186 The law allows parties to seek recusal of judges they have reason to believe are biased, but provides that if timely request for recusal is not made, it is waived. *Shanahan v. State,* 1960 OK CR 59, ¶¶ 7–12, 354 P.2d 780, 782–84; *Holloway v. Hall,* 1920 OK 287, 79 Okla. 163, 192 P. 219, 220, *citing Ex Parte Hudson,* 3 Okl.Cr. 393, 106 P. 540 (1910), and *Ex Parte Hudson,* 3 Okl.Cr. 393, 107 P. 735 (1910) (denying Petition for Rehearing); 20 O.S.1991, § 1403.

¶ 187 We have examined the argument of Appellant carefully, including statements and rulings of the court that have been set out in Appellant's brief, and are satisfied that

Judge Black was unbiased, that he bore no personal animosity against Appellant, and that he gave him a fair trial. We find no plain error.

## CLAIMED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

### Failure to Preserve Issues

¶ 188 Appellant claims in his Subproposition 15(A) that his trial counsel was ineffective in failing to make timely, specific objections, request admonishments, request a mistrial, or take other appropriate actions to properly preserve issues for appellate review issues raised in Propositions 5(B) (Waived Jury for Competency Trial), 8(D) (Victim Impact), 8(E) (Hearsay from Terri Smith and Deputy Scott, Physical Evidence from the Fox Murder, and Frederick's footprint found at Fox's House), 9(B) (Did Not give Instruction No. 4–60 on Homicide—Causation, *sua sponte* ), 9(D) (Did Not Give an Instruction, *sua sponte,* on Insanity), 12(M) (Duplicative Aggravation Evidence), 12(S) (Presence of Accused at All Stages of Proceedings), 12(T) (Moratorium on Death Penalty), 13(A) (Judicial Bias), 13(B) (First Stage Prosecutorial Misconduct), and 13(C) (Second Stage Prosecutorial Misconduct), *supra.* We have already examined each of these propositions separately in this opinion and found no error, except for some improper hearsay attributed to the first responders at the Fox murder crime scene, and we found that error to be harmless beyond a reasonable doubt. Appellant admits that Propositions 12(M), 12(S), and 12(T) have been clearly determined by this Court in prior cases to be contrary to Appellant's position.

¶ 189 We held in *Guance v. State,* 1988 OK CR 39, ¶ 9, 751 P.2d 1074, 1076: "The standard of review for ineffective assistance of counsel is two-pronged: first, appellant must show that counsel's performance was deficient; second, appellant must show that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). There is a strong presumption that counsel's con-

duct falls within the wide range of reasonable professional conduct, i.e., appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Id.* at 689, 104 S.Ct. [at]2065."

It is well established that where there is no error, one cannot predicate a claim of ineffective assistance of counsel upon counsel's failure to object. *See e.g., Harris v. State,* 1989 OK CR 15, ¶ 7, 773 P.2d 1273, 1274–75; *Woods v. State,* 1988 OK CR 222, ¶ 14, 762 P.2d 987, 990.

¶ 190 We have examined each of the pages in the record pointed to in Appellant's brief which purportedly contain prosecutorial errors which trial counsel failed to properly preserve for appellate review by failing to object, by failing to request admonishment of the jury, or by failing to move for a mistrial. We find that most of the statements made by the prosecution that were not objected to by defense counsel at trial were not errors at all, but were within the proper scope of fair argument based upon reasonable inferences which can be drawn from the evidence admitted at trial. See discussion of Proposition 13(B) and 13(C) above. Since there was no error in those instances, there can be no valid ineffective assistance of counsel claim based on failure to object. *Id.* In the very few instances where arguably there were grounds for objection, there is no reasonable possibility that any error in those instances would have changed the outcome of the trial, either as to guilt or innocence or as to punishment. See Proposition 13(B) and 13(C) above. Therefore, we can say with assurance that the failure of trial counsel to object or further preserve the record for appeal did not amount to ineffective assistance of counsel. *Id.*

### Failure to Use Available Evidence

¶ 191 Appellant in Subproposition 15(B) claims trial counsel was ineffective in seven (7) specific instances for failure to use available evidence at trial. He asks us to consider the exhibits he presents in support of his Rule 3.11 Motion and grant his motion for further evidentiary hearing in the trial court. Rule 3.11, *Rules of the Oklahoma Court of*

*Criminal Appeals,* Title 22 O.S., Ch.18, App. (2000).

¶ 192 **First,** Appellant claims his trial counsel was ineffective for failing to produce available evidence that "Appellant had smoked 'four joints' of marijuana on the day of, and prior to, Beck's death." Exhibit "J" of his Rule 3.11 motion to supplement direct appeal records is an Oklahoma County Sheriff's Department (OCSD) interview with witness Bobby Joe Hollingshead dated November 29, 1989. Actually the report indicates "**they** had uh, four joints, that's what they said they smoked," referring to Brad Beck and Frederick. (Emphasis added.) In other words, this witness relates that Brad and Jeff [Frederick] said they had smoked a total of four joints between them over an unspecified period of time.

¶ 193 This is not a significant change from testimony at the 1998 trial when Hollingshead was asked, "And while Jeff was there and Brad was there, they were smoking marijuana and drinking wine, weren't they?" He answered, "Yes." This exhibit does not show ineffective assistance of counsel for failure to use available evidence.

¶ 194 **Second,** Appellant claims his trial counsel was ineffective for failing to use available evidence to prove a waiver of physician-patient privilege by voluntary disclosure to a third party. 12 O.S.1991, § 2511. We held above in Proposition 8(A) that the contents of the sealed medical records of the murder victim in Frederick's case were not relevant to any issue relating to Frederick's guilt or innocence, and therefore the trial court properly restricted comments and evidence about the privileged matters which may have been revealed in the records. Section 2511, *Id.,* does not apply to the facts of this case. By its clear terms, it provides: "A person upon whom this Code confers a privilege against disclosure waives the privilege if he or his predecessor voluntarily discloses or consents to disclosure of any significant part of the privileged matter." *Id.* In this case Brad Beck is the holder of the privilege and it is personal to him. He has no predecessor in this privilege. Appellant has not suggested in his brief, motion, or exhibits that Brad

Beck voluntarily (before his death) disclosed or consented to disclosure of any privileged matter. The waiver provided in § 2511 cannot be triggered by actions of third persons without the consent of the privilege holder or his or her predecessor. Since the legal strategy that Frederick on appeal mistakenly suggests his trial counsel should have pursued would have been ineffectual, Appellant completely fails to show ineffective assistance of trial counsel. Furthermore, the contents of the sealed medical records in this case are still not relevant to any issue relating to Frederick's guilt or innocence. Trial counsel was not ineffective, and this claim is denied.

¶ 195 **Third,** Frederick claims his trial counsel was ineffective for failing to seek recusal of the trial judge for bias. We have determined under Subproposition 13(A) that the trial judge was not biased, and he gave the defendant a fair trial. This claim is without merit.

¶ 196 **Fourth,** Appellant claims his trial counsel was ineffective for failing to use necessary procedures to compel the testimony of Frederick's dying sister, Corey Headley, from Raton, New Mexico. She was so ill in 1998 that she insisted that she could only come to Oklahoma if the expenses of her traveling companion (caregiver) were paid to travel with her. Payment was arranged by trial counsel.

> "However, at the last minute, Ms. Headley, who was seriously ill and could travel only with great difficulty, backed out and refused to appear voluntarily despite arrangements having been made to reimburse travel expenses for both Ms. Headley and her caregiver...." Appellant's Rule 3.11 Motion, Affidavit, Exhibit "B."

¶ 197 Ms. Headley was suffering from cancer at that time and died on January 30, 2000. Trial counsel was not ineffective for trying to get her to come voluntarily. It is not certain, considering her poor health, that a magistrate in New Mexico would have compelled her to travel to Oklahoma pursuant to the Uniform Act to Secure Attendance of Witnesses from Without a State in Criminal Proceedings. See 22 O.S.1991, § 721 et seq. Since Appellant says she "was seriously ill and could travel only with great difficulty," it

would appear that she "backed out and refused to appear" because she was unable to travel.

¶ 198 It is not likely that Ms. Headley's testimony would have been as significant as Appellant suggests. Frederick had claimed to his psychiatrist that he was sexually abused as a child by his mother. Ms. Headley had told Appellant's investigators that she had been sexually abused by their mother but had no knowledge that Frederick was sexually abused. She knew that Frederick was physically abused, but Frederick's brother testified to that fact at trial. Her testimony would have been mainly cumulative of testimony from other family members. As a matter of reasonable trial strategy, counsel might have preferred not to use Ms. Headley, who was an ex-convict, ex-drug-abuser, and former mental patient, but instead to use Frederick's brother James, a university security guard in Tulsa, to describe the physical abuse Frederick received as a child. Further, Ms. Headley had never observed Frederick's multiple personalities although she was close to her brother. Since symptoms of MPD usually develop over a long period of time, beginning in childhood, her testimony would have supported Dr. Pennal's opinion that Frederick was malingering and not suffering from Multiple Personality Disorder.

¶ 199 **Fifth,** Appellant claims his trial counsel was ineffective for failing to prepare Dr. Coons with available evidence of Multiple Personality Disorder (MPD) observed while Frederick was in a Texas jail in 1990. Appellate counsel, Wendell Sutton, says in his Rule 3.11 Motion affidavit, Exhibit "X," that he spoke with Dr. Coons by phone on or about January 31, 2000. According to Sutton's affidavit, Dr. Coons told him:

> "[O]ne circumstance that might have made a significant difference in his ability to make a diagnosis for MPD was if any witness had personal knowledge that Mr. Frederick had continued to exhibit multiple personality symptoms throughout the first year he was incarcerated in Texas." (Exhibit "X.")

Dr. Coons also told Sutton he would be available to testify for $175.00 per hour.

¶ 200 Then on February 18, 2000, Don Cravens, retired investigator for the Oklahoma County Public Defender's Office, signed an affidavit saying that on December 11, 1997, he had interviewed Sheriff Little, of Dallam County, Texas, who told him Frederick had continued to be "different personalities," switching between 'Earl' and 'Jeff' almost the whole time of his incarceration. Exhibit "V." Cravens said he could have testified at the trial in 1998, "but I was never called to testify." *Id.* Cravens, of course, could not have testified, as this would have been hearsay. Sheriff Little, Officer Tim Bell, and Appellant's Texas attorney David Green all testified about Frederick's display of personalities. On cross-examination by defense counsel, Sheriff Little testified that he remembered his interview with Cravens. Sheriff Little testified at trial to the same observations he had related to Cravens. Counsel clearly discussed Sheriff Little's pretrial statement and testimony at trial with Dr. Coons, both before Dr. Coons testified and on the record, under oath, before the jury. Trial counsel asked Dr. Coons, in the sentencing stage, whether he was aware that Sheriff Little "testified yesterday that for the time period he was in their jail, sometimes he would be different people?" Dr. Coons answered, "I was made aware of that today."

¶ 201 Counsel then asked, "Do you think that was just malingering or do you think that was part of what was going on with him psychologically?" Dr. Coons answered:

"It's hard to say. Either might be plausible. If he was showing other ego states for a whole year, it might be more likely that he has [dissociative] identity disorder and is just hiding his personality states now[.][O]r on the other hand, he may have been trying to fake and just decided it wasn't working for him after a year. Can't really say."

¶ 202 Obviously, in January 2000, leading questions were propounded to Dr. Coons by appellate counsel, suggesting that the information from Sheriff Little contained in Craven's affidavit was newly discovered. Dr. Coons did not remember that, in fact, he had already been presented with, and had already testified about, this same information

at trial. Trial Counsel was not guilty of the dereliction he was accused of, and was **not** ineffective in this instance.

¶ 203 **Sixth,** Appellant complains that his counsel was ineffective because he failed to request the trial judge to specifically instruct the jury that Appellant's severe childhood head injury could be considered as mitigation evidence. When he was a seven-year-old child, Frederick received a cracked skull and was knocked unconscious when he was accidentally hit with a baseball bat. Dr. Pennal testified about this injury and was even able to see the scar from that blow. Although this childhood brain injury wasn't specifically added to the already lengthy list of 15 mitigating circumstances, it was covered by the concluding sentence of the mitigation instruction: "In addition, you may decide that other mitigating circumstances exist, and, if so, you should consider those circumstances as well." The lack of a more specific instruction regarding this childhood injury of the Appellant could not have determined the verdict in this case, and the failure to request such an instruction does not establish ineffective assistance of counsel. This subproposition is denied.

¶ 204 **Seventh,** Appellant claims his trial counsel was ineffective for failing to use available evidence to present and support an *Ake* request for neurological testing and evaluation for organic brain damage. Dr. Pennal requested neurological evaluation of headache disorder relating to Appellant's migraine headaches in 1990. An evaluation was conducted January 25, 1990, by John R. Ellis, M.D., Assistant Professor of Clinical Neurology, Texas Tech School of Medicine, Amarillo, Texas. See Rule 3.11 Motion, Exhibit "P." This examination was referred to in Dr. Pennal's testimony in 1992, which was read to the jury in the 1998 trial, and was considered by Dr. Coons. Apparently no further neurological testing was considered necessary by Dr. Coons or the Oklahoma County Public Defender's Office. This subproposition is denied.

### Motion for Evidentiary Hearing Under Rule 3.11

¶ 205 We have examined Appellant's Motion for Evidentiary Hearing Under Rule

3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22 O.S., Ch.18, App. (2001), and Proposition Fifteen in his brief in chief, and we have determined that there is **no** strong possibility that trial counsel was ineffective for failing to utilize or identify the complained of evidence, and therefore we find that no evidentiary hearing is necessary. Appellant's Proposition Fifteen and his motion for evidentiary hearing, 15(C), are denied.

## INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

¶ 206 In his sixteenth proposition, Appellant claims that he has been denied effective assistance of his appellate counsel. In Subproposition 16(A), Appellant claims his appellate counsel was denied access to the prosecutor's file despite the fact that his *trial* counsel was granted access to the file under the prosecutor's open file policy. Defense counsel has a right to discovery of information in the prosecutor's file in two circumstances: (1) He has a constitutional right to discovery of exculpatory, material evidence; and (2) He has a statutory right to discovery to the extent discovery is provided in the Oklahoma Criminal Discovery Code, 22 O.S.Supp.1998, §§ 2001–2002. The time of the statutory right to discovery is limited as follows:

(1.) "All issues relating to discovery, except as otherwise provided, will be completed at least ten (10) days prior to trial." 22 O.S.Supp.1998, § 2002(D).

(2.) "If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under the Oklahoma Criminal Discovery Code, such party shall promptly notify the other party, the attorney of the other party, or the court of the existence of the additional evidence or material." 22 O.S. Supp.1998, § 2002(C).

Thus, all statutory discovery is limited to ten (10) days prior to trial, or at the latest, during trial as to items newly discovered, if previously requested or ordered.

¶ 207 The only discovery provided on appeal would be the constitutional right to discovery of exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and cases construing *Brady*. In *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), the United States Supreme Court reiterated the test for materiality of exculpatory evidence:

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

Appellant has not claimed that any exculpatory evidence has been withheld from him by the prosecution. Therefore, he has no right to examine the prosecutor's files and has not been denied due process or effective assistance of appellate counsel.

¶ 208 In Subproposition 16(B), Appellant claims his appellate counsel made an internal office request within the Oklahoma County Public Defender's Office, and that request was denied, for funds to hire experts necessary to present available mitigating evidence to establish prejudice on direct appeal. He says this denial denied him procedural due process and or effective assistance of appellate counsel. He then asks this Court for an evidentiary hearing to address this issue. This cryptic proposition is not supported by argument or citation of authority, although he refers to several previous footnotes in his brief containing citations: footnotes 10, 26, 28, and 78–80. Footnote 10 relates to Appellant's first proposition, claiming an *Ake* violation because he had no psychiatrist to assist him in cross-examining Dr. Pennal in the 1992 trial. Footnote 26 relates to his Proposition 5(E) where he states there was an *Ake* violation for failure to provide him further mental health evaluation and treatment in a therapeutic setting or secure, in-patient facility. Footnote 28 contains citations of authority pertaining to his Subproposition 5(F), "Exclusion of Defense Testimony—First Stage." His footnotes 78–80 refer to his claim of denial of access to the prosecution file during appeal, which we considered in the above Subproposition 16(A). The propo-

sitions referred to in his cited footnotes were considered fully in this opinion and did not provide a basis for reversing his conviction and sentence and neither does this complaint about the budgeting of funds within his own office. This subproposition and the request for evidentiary hearing is denied.

## ACCUMULATION OF ERRORS

¶ 209 In Proposition Seventeen, Frederick asserts that an accumulation of errors, even if none is sufficient standing alone to warrant reversal or modification, deprived him of a fair trial. After reviewing all such alleged errors, it is the opinion of this Court that Appellant did in fact receive a fair trial. No errors occurred which singly or in the aggregate would require reversal or modification of this case, and this proposition is denied. *Mollett v. State*, 1997 OK CR 28, ¶ 63, 939 P.2d 1, 15, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998).

## MANDATORY SENTENCE REVIEW

¶ 210 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S. 1991, § 701.12. As noted above, sufficient evidence existed to support both aggravating circumstances alleged by the State and found by the jury:

1. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and

2. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

¶ 211 The trial court specifically instructed the jury that evidence had been introduced as to 15 mitigating circumstances.[15] The trial court also instructed the jury as follows: "In addition, you may decide that other mitigating circumstances exist, and, if so, you should consider those circumstances as well."

¶ 212 After carefully weighing the aggravating circumstances and all mitigating evidence, we concur with the jury determination that the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate and not imposed under the influence of passion, prejudice, or any other arbitrary factor. We find that Frederick, despite his claimed amnesia for varying periods of time, is not incompetent and was not insane at the time of the crime. We find that imposition of the death penalty in this case does not violate the United States Constitution's prohibition against "cruel and unusual punishment" nor the Oklahoma Constitution's prohibition against "cruel or unusual punishment." We further find no error which warrants reversal or modification of the sentence.

## DECISION

¶ 213 Earl Alexander Frederick, Sr.'s conviction of Murder in the First Degree and his

15. 1. The defendant does not have a history of arrests for violent crimes;
2. The defendant's judgment was impaired by alcohol and marijuana abuse;
3. The defendant suffers from a dissociative fugue;
4. The defendant has no memory of the time period covering the killings of Bradford Beck and Shirley Fox;
5. The defendant has become religious since his arrest in 1989 and is troubled by his inability to remember events surrounding the homicides;
6. The defendant requested to be brought to court to plead no contest to a crime he maintains he cannot recall;
7. The defendant was raised in a family where the children were abused;

8. The defendant has been a model prisoner since 1989, while incarcerated and awaiting this trial in the Dallam County, Texas, Jail, the Oklahoma State Penitentiary, and the Oklahoma County Jail;
9. The defendant has a brother who loves him and does not wish for him to be executed;
10. The defendant has children who love him and do not wish for him to be executed;
11. The defendant has grandchildren;
12. The defendant was an Assistant Police Chief in Noble, Oklahoma, from October 1973 to July 1976;
13. The defendant has a history of drug and alcohol abuse;
14. The defendant served in the Air Force from October 1976 to January 1979;
15. The defendant has demonstrated remorse for the homicides.

Judgment and Sentence of Death, upon retrial, are hereby **AFFIRMED.**

¶ 214 The Honorable STEVEN W. TAYLOR, District Judge for the 18th Judicial District of Oklahoma, was appointed on this appeal to serve in lieu of Judge CHAPEL who recused.

LUMPKIN, P.J., and JOHNSON, V.P.J., and STRUBHAR and TAYLOR, JJ., concur.